**MCI COMMUNICATIONS CORPORA-TION and Subsidiaries, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**TELECOM\*USA, INC. and Subsidiaries, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civil Action Nos. 96–259 SSH, 96–258 SSH.**

United States District Court, District of Columbia.

June 3, 1998.

Albert H. Turkus, Pamela F. Olson, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, for plaintiffs.

Stuart D. Gibson, Margaret M. Earnest, Tax Division, U.S. Department of Justice, Washington, DC, for defendant.

## *OPINION*

STANLEY S. HARRIS, District Judge.

Before the Court are the parties' cross-motions for summary judgment, corresponding oppositions, plaintiffs' reply, and plaintiffs' notice of recent authority. After careful consideration of the entire record, the Court denies plaintiffs' motion for summary judgment and grants defendant's motion for summary judgment. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule ... 56," the Court nevertheless sets forth its analysis. *See* Fed.R.Civ.P. 52(a).

## BACKGROUND

Prior to 1986, when the Tax Reform Act of 1986, Pub.L. 99–514, 100 Stat.2085 (1986), was passed, the tax code encouraged taxpayers to invest in certain property or assets by offering two interrelated programs—the investment tax credit ("ITC"), and the accelerated cost recovery system ("ACRS").[1] The ITC provided taxpayers with a 10% tax credit for investing in qualified assets, and the related ACRS program allowed taxpayers to

---

1. The ITC was originally created in 1962 by § 2 of the Revenue Act of 1962, Pub.L. No. 87–834, 76 Stat. 960. ACRS deduction rules were part of §§ 167 and 168 of the 1954 Code.

deduct a portion of an asset's value during each year of the asset's life.

Under the ACRS program, however, the asset was still considered to be worth its full cost, even after the taxpayer had received a tax credit that reduced the "real" cost of the asset. Thus, taxpayers were getting a double benefit because they received a tax credit, and they also were allowed to deduct depreciation of the full cost of the asset. For example, if a taxpayer's cost for an asset were $1,000, the taxpayer (a) would receive an investment tax credit of $100 (10% of the $1,000 cost of the asset), and (b) could deduct, through depreciation deductions, $1,000 (the full cost of the asset) over the life of the asset. See I.R.C. §§ 46(a)(1) and 46(b)(1).[2]

In 1982, Congress passed the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324 (1982) ("TEFRA"), which provided for an adjustment to the property's "basis," the value of the property used in determining depreciation deductions.[3] Even after TEFRA was passed, however, a substantial amount of double benefit was still available.

This led many taxpayers to direct investments into categories of assets that qualified for the special treatment of the ITC and ACRS programs, which was considered to have had a detrimental effect on the economy. See, e.g., S.Rpt. 99–313, 99th Cong.2d Sess., at 96 (1986). Tax-favored sectors attracted a disproportionate share of investment, to the detriment of tax-disadvantaged sectors.

Congress responded by passing the Tax Reform Act of 1986, Pub.L. 99–514, 100 Stat. 2085 (1986), which repealed the tax credit for new purchases and lowered overall corporate tax rates. Because some taxpayers already had committed to substantial asset acquisitions based on the expected benefits of the ITC program, Congress set up a complex series of transition rules to phase out the ITC over time. Under those rules, taxpay-

ers wishing to receive the full value of ITC credits were required to place the qualifying assets into service and take the credits in a timely manner. Qualifying assets, i.e., those purchased prior to 1986, that were placed into service before 1987, were allowed the full 10% credit, while those put into service during 1987 earned a reduced credit of 8.25%. Those put into service during 1988 or later received a 6.5% credit. This phasedown, known colloquially as the "ITC haircut," thus encouraged taxpayers to put qualified assets into service sooner rather than later. See I.R.C. § 49.

Under these transitional rules, Congress also eliminated the double benefit by requiring basis reductions to equal 100% of the credits earned. This meant that a qualifying asset costing $1,000, put into service in 1986, would earn a $100 credit, and its basis would be reduced by the entire $100, to $900.

Tax credits, such as those at issue in the ITC program, can generally be used only to reduce income taxes owed; they cannot be used to reduce taxes to less than zero so as to generate a tax refund. Absent a rule specifically allowing the credits to be carried forward to future years (or carried back to previous years), the tax credit would be lost. The rules of the ITC program contained both carryback and carryforward rules, and until 1986 they were simple: credits could be carried back up to three years or forward up to fifteen years. I.R.C. § 39(a). Taxpayers unable to carry credits back commonly saved their credits until they generated sufficient profits against which to offset them, because other than reductions in value due to inflation, the credits retained their full value. One of the 1986 changes, however, was the application of the ITC haircut to these types of unused tax credits. A 10% ITC credit earned in 1986, but not used that same year, shrank to 8.25% in 1987, and to 6.5% in 1988.

Because the corporate tax rates were being lowered, taxpayers who were losing the

---

2. For the sake of brevity, sections of the code that have been repealed, such as this one, will not be repeatedly identified with the label "former."

3. TEFRA added to the Code a new provision, § 48(q)(1), which provided in pertinent part that "if a credit is determined ... with respect to ... property, the basis of such property shall be reduced by 50 percent of the amount of the credit so determined."

value of their ITC credits were simultaneously benefitting from gradually lowering tax rates. However, the transition rules set up a system that reduced the basis of assets in the year when the ITC was earned, instead of when the ITC was actually used. For example, a taxpayer who put a $1,000 asset into service in 1986 earned a 10% ITC credit of $100, but had to reduce the taxable basis of the asset (for ACRS purposes) by that same amount, to $900. Two years later, when the taxpayer was able to use the credit, it had been reduced by the ITC haircut from $100 down to $65, even though the asset's basis had already been reduced by the full $100 and could not be readjusted to take into account that the taxpayer had actually utilized only $65 of credit. Such a taxpayer therefore had a basis of $935 for the asset ($1,000 paid in 1986, minus the $65 allowed as a credit in 1988), but had to depreciate the asset as if it had paid $900 ($1,000 paid in 1986, minus the $100 ITC earned in 1986), thus losing $35 of basis that would otherwise have been used for deduction calculations.

Plaintiffs MCI and TELECOM*USA filed claims with the IRS in 1994 seeking refunds to recover such lost bases.[4] The IRS denied their claims entirely, and, after plaintiffs had exhausted their administrative remedies, they filed this action.[5]

Plaintiffs assert three grounds for recovering the lost basis of their investment properties. Plaintiffs first assert that they should be allowed to amend their returns for the years in which qualifying assets were placed into service by upwardly adjusting their assets' bases to reflect the amount of ITC actually utilized. (Count I). Plaintiffs alternatively assert that they should be allowed to count the lost basis as additional investment, warranting redetermination of the basis (Count II), or deduct the amount of the credit that was taken away due to the ITC haircut (Count III).

Plaintiffs contend that Congress did not intend for them to lose basis in their assets. They contend that a proper reading of the code leads to the interpretation they seek. They ask the Court to disagree with IRS Revenue Ruling 87–113, 1987–2 C.B. 33, and the reasoning of the Federal Circuit in *B.F. Goodrich Co. v. United States,* 94 F.3d 1545 (Fed.Cir.1996). Defendant responds that the tax code does not allow for recovery of plaintiffs' lost basis. Defendant also requests that the Court exclude from its consideration a declaration of Kenneth L. Wertz, plaintiffs' expert witness.

## STANDARD OF REVIEW

Summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Taxpayers carry the burden of establishing that Congress clearly authorized the benefits or deductions they seek. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); *Interstate Transit Lines v. Commissioner of Internal Revenue,* 319 U.S. 590, 593, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943). Exemptions from taxation are to be construed "narrowly," *Bingler v. Johnson,* 394 U.S. 741, 751–52, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969), and are "not to be implied," but "unambiguously proved." *United States v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988).

## ANALYSIS

### I.  Admissibility of the Wertz Declaration

Before turning to each of plaintiffs' claims, the Court first addresses defendant's allegation that the Wertz declaration is "irrelevant and inadmissible." Def's Mem. in Opp'n to Pls.' Mot. for Summ. J. at 4. Defendant claims that this declaration falls outside the scope of expert testimony permitted by Federal Rule of Evidence 702 and therefore must be excluded.

---

4.  TELECOM*USA filed an additional Claim for Refund in 1995 that also was rejected on the same grounds.

5.  MCI and TELECOM*USA filed separate Civil Actions, Nos. 96–258 and 96–259. Pursuant to the Court's Order of July 17, 1996, they were consolidated.

Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The advisory committee's note to Rule 702 states that

> [t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

Fed.R.Evid. 702 advisory committee's note. It is well settled that determining the admissibility of expert opinions falls within the broad discretion of the trial court. *See, e.g., Steinberg v. Indemnity Ins. Co. of North America,* 364 F.2d 266 (5th Cir.1966); *United States v. Hearst,* 412 F.Supp. 893 (N.D.Cal.1976).

Defendant cites *United States v. Hawley,* 592 F.Supp. 1186, 1190 (D.S.D.1984), *aff'd,* 768 F.2d 249 (8th Cir.1985), to support its contention that the Court should disregard Wertz's declaration. Although the court in *Hawley* excluded testimony from that defendant's expert because it would have been irrelevant and "would not have assisted the trier of fact to understand the evidence," *Hawley,* 592 F.Supp. at 1190, that case stands for the proposition that a court has broad discretion to determine whether proffered evidence will be of assistance in understanding highly technical evidence. Such evidence should, of course, be excluded when it is in fact nothing more than a legal conclusion.[6] The declaration has assisted the Court in understanding the technical tax issues presented by this action, and the Court declines to exclude it.

## II. Count I

In Count I, plaintiffs contend that they should be able to amend their returns for the years in which their property was placed in service to reflect the amount of the ITC they actually received. This argument is very similar to one rejected by the Court of Appeals for the Federal Circuit in *B.F. Goodrich,* 94 F.3d at 1545. Plaintiffs argue that *Goodrich* is inapposite and was wrongly decided, but the Court disagrees.

In that case, plaintiff B.F. Goodrich Company ("Goodrich") purchased assets prior to 1986, but did not put them into service until 1986 and 1987. Since those assets qualified for the transitional ITC program, they earned Goodrich a 10% credit (for assets put into service in 1986), and an 8.25% credit (for those put into service in 1987). Knowing that it was unable to use those credits in either 1986 or 1987, Goodrich anticipated that they would be subject to the haircut provisions and would be reduced to 6.5% when they were eventually used in 1988 or beyond. Goodrich therefore reduced the basis of those properties by the 6.5% it concluded it eventually would be able to use, instead of by the 10% the Code required.

Goodrich argued that the use of the word "determined" in I.R.C. § 48(q) allowed it to calculate the amount of basis reduction relative to the credit that eventually would be taken instead of the credit earned. Similarly, plaintiffs here contend that the credit is not really "determined" until it is actually utilized. The Court rejects that reading of the Code, and agrees with the Federal Circuit that an investment tax credit is determined when the property is placed in service and that an asset's basis must be reduced by the full amount of an ITC credit in the year it is "determined." *See Goodrich,* 94 F.3d at 1549.

I.R.C. § 48(q) provides that "if a credit is determined under 46(a) . . ., the basis of such property shall be reduced by 100% of the amount of the credit so determined." I.R.C. § 46(a) specifies that "the amount of the investment credit determined under this section for any taxable year shall be an amount

---

6. Much of the instant declaration is background information to assist the Court. To the extent that the Wertz declaration does contain some legal conclusions that are irrelevant, such conclusions have been excluded from consideration.

equal to the sum" of certain percentages of the qualified investment, which consists of the property placed in service during that taxable year. Thus, under I.R.C. § 46(a), a credit is determined in the year the qualified asset is placed into service, and I.R.C. § 48(q) therefore mandates a reduction in basis that same year, when the credit is determined. This was the conclusion of the IRS in Revenue Ruling 87–113, 1987–2 C.B. 33–35, the conclusion of the Court of Federal Claims in *B.F. Goodrich Co. v. United States,* 32 Fed.Cl. 571 (Fed.Cl.1995), the conclusion of the Federal Circuit in *B.F. Goodrich,* 94 F.3d at 1545, and it is the conclusion of this Court as well.

Plaintiffs contend that *Goodrich* is inapposite because the plaintiff in that case sought to take the deduction before its credits were reduced by the ITC haircut, while the instant plaintiffs waited until the credits were actually subjected to the ITC haircut to do so. *Goodrich* did reject the "reasonable expectation" theory proffered by the plaintiff in that case, but the central holdings there were that credits are "determined" in the year the assets are placed in service, and that tax credits must be subtracted from assets' basis the same year in which such assets are put in service.

The *Goodrich* court noted that its conclusion was similar to that promulgated by IRS Revenue Ruling 87–113, 1987–2 C.B. 33–35, in which a taxpayer faced a factually similar situation. In that ruling, the IRS stated:

> Because the property was placed in service after December 31, 1985, [taxpayer] must reduce its depreciable basis in the property to $900,000 under the 100–percent–of–credit basis reduction rule in section 49(d)(1) of the Code. The basis must be reduced in the year the property is placed in service, in 1986. However, because it is carried forward to 1988, the $100,000 credit is subject to the 35–percent credit reduction under section 49(c)(2). Thus, the credit eventually taken by [taxpayer] in 1988 is $65,000 ($100,000 reduced by 35 percent), even though [taxpayer] reduced its basis in the property by $100,000 in 1986. [Taxpayer] is not allowed to increase its basis in the property to reflect the reduction in the investment tax credit carryforward under section 49(c)(2).

*Goodrich* 94 F.3d at 1550. Plaintiffs' contention that *Goodrich* is limited to the issue of reasonable expectations is incorrect.

Plaintiffs also contend that *Goodrich* was wrongly decided. They rely on a piece of legislative history for support, but their reliance is misplaced. Plaintiffs here, like the plaintiff in *Goodrich,* point to an apparently contradictory passage in the legislative history as evidence that their interpretation should prevail:

> A taxpayer is required to reduce the basis of property that qualifies for transition relief ("transition property") by the full amount of investment credits earned with respect to the transition property (after application of the phased in 35–percent reduction described below).

H.R.Rep. No. 841, 99th Cong., 2d Sess. II–63 (1986). Plaintiffs contend that this passage indicates that asset basis should be reduced by the tax credits as carried forward, instead of when initially determined. Though the Court notes that any use of legislative history in a case such as this is unnecessary given the clarity of the text, it nonetheless reaches the same conclusion as the *Goodrich* court. When read in context with the nearby text, the passage at issue clearly deals with current-year credits, not carryforward credits, and is thus irrelevant. As the *Goodrich* court noted:

> The quoted excerpt is the first sentence of a paragraph titled "Full Basis adjustment." The next subsection is titled "Reduction of ITC carryforwards and credits claimed under transitional rules." The existence of a separate subsection expressly devoted to carryforward credits clearly implies, as the Government argues, that the quoted excerpt—which is part of the preceding section—deals with different subject matter, namely current-year credits.

*Goodrich,* 94 F.3d at 1549. When read in its proper context, the legislative history offered by plaintiffs is unpersuasive, and plaintiffs' first basis for a refund, allowance of additional ACRS deductions based on the interpretation discussed, is therefore denied.

### III. Count II

Plaintiffs' second theory for recovery, treating the taxpayer's increased share of costs as an additional investment requiring a redetermination of basis, is putatively based on I.R.C. § 168 and proposed Treas.Reg. 1.168–2(d)(3)(i). These sections allow for redeterminations of the unadjusted basis of property where a taxpayer's investment in a property has changed, such as where there is a contingent purchase price and a discharge of indebtedness. For example, proposed Treas.Reg. § 1.168–2(d)(3)(ii) contains an example of additional consideration being paid to a seller after the asset began producing a certain level of profits. *See* Pls.' Mot. for Summ.J. at 33.

■ Here, the government, through the ITC haircut, has reduced the amount of tax credits and depreciation allowances; this has increased the cost of carrying the assets. That the amount of the ITC carryforward is statutorily reduced, however, does not affect the basis that is determined at the time the property is placed into service. Adjustments for this type of change are neither in the text, contemplated in the examples, nor consistent with other sections of the tax code.

Although defendant's motion for summary judgment responds to plaintiffs' second claim with fewer than thirty lines of text, there is no detailed analysis to perform on this count. Plaintiffs have failed to carry the substantial burden of taxpayers seeking exemptions from taxation. *See New Colonial Ice*, 292 U.S. at 440, 54 S.Ct. 788; *Interstate Transit Lines*, 319 U.S. at 593, 63 S.Ct. 1279; *Bingler*, 394 U.S. at 751–52, 89 S.Ct. 1439; *Wells Fargo Bank*, 485 U.S. at 354, 108 S.Ct. 1179. Plaintiffs' second basis for a refund, counting the lost basis as additional investment based on I.R.C. § 168 and Prop.Reg. 1.168–2(d)(3)(i), is therefore denied.

### IV. Count III

Plaintiffs' third theory for recovery is essentially the same as the alternate theory rejected by the Federal Circuit in *Goodrich*, 94 F.3d at 1550. There, as here, the plaintiff relied on I.R.C. § 196(a) to deduct the amount of the ITC that was lost to the ITC haircut. That section allows taxpayers to deduct a portion of a credit that has expired due to non-use. It provides in relevant part:

Section 196. Deduction for certain unused business credits.

(a) ALLOWANCE OF DEDUCTION.—If any portion of the qualified business credits determined for any taxable year has not, after application of section 38(c), been allowed to the taxpayer as a credit under section 38 for any taxable year, an amount equal to the credit not so allowed shall be allowed to the taxpayer as a deduction for the first taxable year following the last taxable year from which such credit could, under section 39, have been allowed as a credit. . . .

(c) QUALIFIED BUSINESS CREDITS.—For purposes of this section, the term "qualified business credits" means—

(1) the investment credit determined under section 46(a) (but only to the extent attributable to property the basis of which is reduced by section 48(q)), . . . .

(d) SPECIAL RULE FOR INVESTMENT TAX CREDIT.—In the case of the investment credit determined under section 46(a) (other than a credit to which section 48(q)(3) applies), subsection (a) shall be applied by substituting "an amount equal to 50 percent of" for "an amount equal to".

Thus, if a § 38(c) limitation prevents a taxpayer from using an investment tax credit, § 196 authorizes a future deduction in an amount equaling 50 percent of the credit disallowed.

■ This Court is in agreement with the *Goodrich* court, which evaluated the same provisions and concluded that the section in question dealt with carryforward credits, not statutory reductions such as those imposed on plaintiffs. That court stated:

We conclude that Goodrich cannot avail itself of the § 196 deduction. According to § 196(a), the deduction shall be allowed "for the first taxable year following the last taxable year for which the credit

could, under § 39, have been allowed." Section 39 specifies a 15-year period during which unused credits may be carried-forward. Thus, the "last taxable year" referred to in § 196(a) is, in the words of § 39, "15 taxable years following the unused credit year." We agree with the Court of Federal Claims that the statute permits a deduction only at the end of the 15-year carryforward period. The requirement of expiration of the carryforward period is not, as Goodrich argues in its brief, speculation. *Goodrich*, 94 F.3d at 1550. Plaintiffs' investment tax credits did not expire; rather, they were statutorily reduced. Section 196(a) authorizes deductions for carryforward credits that have expired, not for credits that are disallowed by reason of § 49(c). Moreover, to the extent that Congress mentioned the reduction of ITC tax credits being carried forward, it provided that the reduction could not be allowed as a credit in any other year. *See* I.R.C. § 49(c)(4)(A).

Plaintiffs contend that the *Goodrich* court erroneously overlooked the fact that once the ITC haircut is imposed, it is imposed forever, and thus there should be no need to wait for 15 years to take a deduction. This is a mischaracterization of § 196, which applies "only where the credit has not, after the application of section 38(c), been allowed ... as a credit." Section 38(c) does not apply to plaintiffs' lost credits, and thus does not allow a deduction under § 196. Plaintiffs have not met the burden of proving that a deduction under § 196 is authorized. Plaintiffs' third basis for a refund, deducting the amount of the credit that was taken away due to the ITC haircut, is therefore denied.

## CONCLUSION

After viewing all of the evidence presented in a light most favorable to plaintiffs, the Court concludes that plaintiffs have failed to establish that they are eligible for the adjustments or deductions sought. The proper route to the tax treatment plaintiffs seek is through the legislative branch.