**TELECOM\*USA, INC., and subsidiaries, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**Nos. 98–5361, 98–5362.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1999.

Decided Oct. 15, 1999.

Albert H. Turkus argued the cause for appellants. With him on the briefs were Pamela F. Olson and Julia M. Kazaks.

Joan I. Oppenheimer, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were Loretta C. Argrett, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, and David I. Pincus, Attorney, U.S. Department of Justice.

Before: WALD, RANDOLPH, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Telecom*USA, Inc. and its subsidiaries, and MCI Communications Corporation and its subsidiaries, (collectively, "Telecom"), appeal the district court's ruling that Telecom is not entitled to the income tax refund it seeks. The case concerns transition rules enacted by Congress in 1986 to cushion the impact of the repeal of the investment tax credit (ITC). Telecom's principal contention is that its basis in depreciable property should be reduced by the amount of ITC it received in the year to which it carried its ITC forward. Following the lead of the Federal Circuit and the Court of Federal Claims, the district court rejected this argument and held that Telecom must instead reduce its basis by the larger amount of ITC first available to it in the year in which it placed the property in service. We agree with the district court and the other courts that have considered this issue, and affirm.

**I**

To put Telecom's claims in context, we begin with a brief history of the depreciation deduction and the ITC. The Internal Revenue Code has long provided for depreciation deductions through which a property owner can deduct the cost of its property over the property's useful life. *See* 26 U.S.C. § 167(a); 26 U.S.C. § 23(*l*) (1934); *United States v. Ludey,* 274 U.S. 295, 297–300, 47 S.Ct. 608, 71 L.Ed. 1054 (1927). Under the straight line method of depreciation, for example, an asset with an

initial cost of $1,000,000, a salvage value of $50,000, and a useful life of 10 years would generate annual deductions of $95,000. *See* 26 U.S.C. § 167(b)(1) (1988); 26 C.F.R. § 1.167(b)–1. Various other methods of depreciation also have been permitted. *See, e.g.,* 26 U.S.C. § 167(b)(2) (1988) (double declining balance method); *id.* § 167(b)(3) (sum of the years-digits method); *see* 26 C.F.R. §§ 1.167(b)–2, 1.167(b)–3.

In the Economic Recovery Tax Act of 1981 (ERTA), Congress adopted a new set of depreciation rules called the Accelerated Cost Recovery System (ACRS). *See* Pub.L. No. 97–34, sec. 201(a), § 168, 95 Stat. 172, 203 (codified as amended at 26 U.S.C. § 168). Intended to stimulate economic expansion, ACRS permits recovery of capital costs for most tangible depreciable property by using accelerated methods over predetermined periods that are generally shorter than the useful life of the asset. *See* 26 U.S.C. § 168(e)(1); S.REP. No. 97–144, at 48 (1981), U.S. Code Cong. & Admin. News at 105, 153. ACRS also eliminates the salvage value limitation, hence allowing the entire cost of the property to be depreciated. *See* ERTA, sec. 201, § 168(f)(9), 95 Stat. at 216.

Although not as old as the depreciation deduction, the investment tax credit dates back to the Kennedy Administration and was also designed to stimulate the economy by encouraging investment. *See* Revenue Act of 1962, Pub.L. No. 87–834, § 2, 76 Stat. 960, 962–73; H.R. CONF. REP. No.87–2508, at 14 (1962), U.S. Code Cong. & Admin. News at 3732, 3745. The most recent incarnation of the ITC, prior to amendment and repeal in 1986, gave taxpayers a one-time credit of 10% of the cost of the property. *See* 26 U.S.C. § 46 (1982). The credit was a dollar-for-dollar offset against a taxpayer's tax liability, *see id.* § 39(a), but could not be used if the taxpayer had insufficient tax liability for the year, *see id.* § 46(a)(3). The unused credits could, however, be carried back and carried forward a specified number of years to reduce the taxpayer's liabilities in those years. *See id.* § 46(b).

The combined use of ITCs and depreciation deductions gave taxpayers generous benefits. For an asset costing $1,000,000, the taxpayer could both claim an ITC of $100,000 (10% of the cost) and deduct $1,000,000 worth of depreciation (the full cost of the asset). In 1982, Congress concluded that this combination was distorting the allocation of capital resources and determined to reduce the level of benefits. *See* S.REP. No. 97–494, at 122 (1982), U.S. Code Cong. & Admin. News at 781, 887–88. A new provision, enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), provided that an asset's "basis"—the value of the property used to determine the total available depreciation deductions—would be reduced by 50% of the amount of the ITC. *See* Pub.L. No. 97–248, § 205(a), 96 Stat. 324, 427 (codified at 26 U.S.C. § 48(q)(1) (1982)). Hence, although an asset originally costing $1,000,000 would continue to yield an ITC of $100,000, it would generate a total of only $950,000 worth of depreciation ($1,000,000 minus 50% of the $100,000 credit).

In 1986, Congress concluded that the ITC was still distorting investment activity by channeling too much investment into tax-favored sectors. *See* S.REP. No. 99–313, at 96 (1986). Thus, in the Tax Reform Act of 1986, Congress repealed the ITC for property purchased in 1986 and thereafter. *See* Pub.L. No. 99–514, § 211, 100 Stat.2085, 2166–70 (codified as amended at 26 U.S.C. § 49(a) (1988)).[1] It made an exception, however, for "transition property"—property purchased prior to 1986 but placed in service in 1986 or later. For such property, the ITC was phased out over a number of years. For calendar

---

1. The Tax Reform Act repealed the "regular" investment tax credit at issue here. *See id.* § 211, 100 Stat. at 2166; 26 U.S.C. § 49(a) (1988). Other investment credits survive. *See* 26 U.S.C. § 46.

year taxpayers, transition property placed in service in 1986 received the full 10% credit; property placed in service in 1987 received a reduced credit of 8.25% of cost; and property placed in service in 1988 or later received a credit of only 6.5%. *See* 26 U.S.C. § 46; *id.* § 49(b), (c)(1), (c)(3)(A), (c)(5)(A) (1988).[2] The phased reduction is known colloquially as the ITC "haircut."

The 1986 amendments included two other changes of significance for this case. First, the haircut was also applied to credits carried forward from the year in which they were first available to the taxpayer. Credits carried forward for use in 1987 were reduced to 8.25%; those carried forward to 1988 and subsequent years were reduced to 6.5%. *See id.* § 49(c)(2), (c)(3)(B), (c)(5)(A). Second, the amount of the basis adjustment for purposes of determining depreciation was changed from 50% to 100% of the amount of the ITC. *See id.* § 49(d)(1).

The following year, the Internal Revenue Service (IRS, or "the Service") issued a revenue ruling to guide taxpayers with respect to the operation of the 1986 amendments. *See* Rev. Rul. 87–113, 1987–2 C.B. 33. Example 1 of that ruling considered the case of a $1,000,000 machine purchased in 1985 and placed in service in 1986, the final 10% year. The ruling stated that under those circumstances, the taxpayer was entitled to an ITC of $100,000 (10% of the $1,000,000 cost) and had to reduce the machine's depreciable basis by 100% of that amount, (i.e., to $900,000).

But what if the taxpayer were unable to use the credit in 1986, and could not use it until 1988? Did the basis for depreciation deductions have to be reduced by the 10% credit available in 1986, the year the property was placed in service, or by the 6.5% credit available in 1988, the year to which the taxpayer carried the credit forward? Example 3 of Revenue Ruling 87–113 addressed that issue, and concluded that the basis had to be reduced by the amount of the credit available in the year the property was placed in service. In the example, the credit available to the company when the property was placed in service in 1986 was $100,000. Accordingly, following the 100% basis reduction rule, the basis had to be reduced to $900,000. This, the IRS concluded, was the case even though the amount of the credit the company received was only $65,000 when it was eventually used in 1988. The company, the IRS said, was "not allowed to increase its basis in the property to reflect the reduction in the investment credit carryforward." *Id.* at 35.

## II

As Telecom acknowledges, its case presents the same situation as that addressed in Example 3 of Revenue Ruling 87–113, and the IRS has treated it in precisely the same way. *See* Telecom Br. at 18 n.12. Telecom owned transition properties placed in service in calendar years 1986 and 1987. The ITC percentages available for those properties in those years were 10% and 8.25%, respectively. When calculating its depreciation deductions in the years the properties were placed in service, Telecom reduced its bases by amounts that reflected those percentages. Telecom was unable to use its ITCs immediately, however, because it had insufficient tax liabilities in those years; it therefore carried the credits forward to 1989 and thereafter. Under the ITC haircut, the percentage received by Telecom in those years was only 6.5%.[3]

---

**2.** Telecom is a calendar year taxpayer. MCI Communications Corp. is a fiscal year taxpayer as to which slightly different percentages apply. *See id.* § 49(c)(3).

**3.** The "Telecom" reference in this paragraph is only to Telecom*USA, Inc. and its subsidiaries. As noted *supra* note 2, MCI Communi-

cations Corporation is a fiscal year taxpayer. It owns transition properties placed in service in fiscal years 1986, 1987, and 1988. The ITC percentages available for those properties were 10%, 10%, and 7.375%, respectively. Like Telecom, MCI carried its ITCs forward to 1989 and subsequent years. As the princi-

Telecom filed claims for refunds with the IRS, seeking the additional depreciation deductions it could have taken had it calculated its properties' bases using the ITCs it actually received. The IRS denied the claims, and Telecom filed refund actions in the district court. Telecom advanced one principal theory and two alternatives in support of its position. Its principal contention was that several interconnected provisions of the Internal Revenue Code permitted it to amend its earlier returns by adjusting its properties' bases upward to reflect the amounts of ITC it actually used. Alternatively, Telecom argued that 26 U.S.C. § 168, as construed in a proposed treasury regulation, entitled it to adjust its bases in the carryforward years to reflect the effective change in the cost of its properties brought about by the haircut applied when its ITCs were carried forward. As a second alternative, Telecom contended that 26 U.S.C. § 196, which provides deductions for portions of tax credits that a taxpayer has not been allowed to use, entitled it to deductions for the difference between the amounts of ITC allowable in the initial and carryforward years.

The district court rejected Telecom's arguments on cross-motions for summary judgment. *See MCI Communications Corp. v. United States*, 26 F.Supp.2d 6 (D.D.C.1998). Relying both on Revenue Ruling 87–113 and on the opinion of the U.S. Court of Appeals for the Federal Circuit in *B.F. Goodrich Co. v. United States*, 94 F.3d 1545 (Fed.Cir.1996), which denied a taxpayer's virtually identical claim, the court rejected Telecom's argument that it should be permitted to adjust its original basis. The court also rebuffed Telecom's alternative efforts to utilize sections 168 and 196, holding those sections inapplicable to the circumstances at issue here.

ples involved are the same, we confine our textual discussion to the calendar year situa-

## III

On appeal, Telecom presses all of the arguments it raised below. There are no factual disputes, and we review the district court's grant of summary judgment de novo. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). To decide this case, we must analyze the interplay of three quite technical statutory provisions. Fortunately, we are not left wholly to our own devices, but rather are assisted by two important interpretive guides. Equally fortunate, the two point in the same direction.

■ The first guide instructs that a taxpayer who seeks a deduction bears the burden of demonstrating a clear entitlement. *See New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934) ("[O]nly as there is clear provision therefor can any particular deduction be allowed."); *Lenkin v. District of Columbia*, 461 F.2d 1215, 1225 (D.C.Cir. 1972) (applying *New Colonial Ice* rule to depreciation deductions); *cf. United States v. Centennial Sav. Bank FSB*, 499 U.S. 573, 583–84, 111 S.Ct. 1512, 113 L.Ed.2d 608 (1991) (citing "rule that tax-exemption and -deferral provisions are to be construed narrowly"); *United States v. Wells Fargo Bank*, 485 U.S. 351, 354–55, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988) ("[E]xemptions from taxation are not to be implied; they must be unambiguously proved."). At oral argument, Telecom agreed that it bears this burden, but insisted that its entitlement to deductions is clear.

■ The second interpretive guide requires us to accord at least some deference to the IRS' revenue ruling. Although a revenue ruling does not have the force and effect of Treasury Department Regulations, *see* 26 C.F.R. § 601.601(d)(2)(v)(*d*), it does constitute "an official interpretation by the Service," *id.* § 601.601(d)(2)(i)(*a*).

tion faced by Telecom.

Accordingly, the Supreme Court and virtually all of the Circuits have indicated that revenue rulings are entitled to some degree of deference.[4]

In *Davis v. United States*, 495 U.S. 472, 484, 110 S.Ct. 2014, 109 L.Ed.2d 457 (1990), the Court indicated that revenue rulings are entitled to "considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use"[5]—two conditions that are roughly satisfied here.[6] *Davis* did not, however, address how this standard compared to the relatively high level of deference applicable to agency interpretations of ambiguous statutes under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[7] The Courts of Appeals have accorded revenue rulings varying degrees of deference, ranging from the level utilized in *Chevron*,[8] to "some weight,"[9] to variations in between.[10]

This court has not had the occasion to decide the precise degree of deference due to revenue rulings, although we have referred to such rulings as "the second most important agency pronouncements that interpret the Code" and have looked to them when neither the statute nor Treasury regulations provided clear guidance. *Stichting Pensioenfonds Voor de Gezondheid v. United States*, 129 F.3d 195, 198

4. See generally *Estate of McLendon v. Commissioner*, 135 F.3d 1017, 1023 (5th Cir.1998) (noting that "virtually every circuit recognizes some form of deference," and that only the Tax Court takes the "position that revenue rulings are nothing more than the legal contentions of a frequent litigant") (citing *Pasqualini v. Commissioner*, 103 T.C. 1, 8, 1994 WL 371893 (1994)); John F. Coverdale, *Court Review of Tax Regulations and Revenue Rulings in the Chevron Era*, 64 Geo. Wash. L. Rev. 35, 81–84 (1995).

5. Subsequently, in *United States v. Thompson/Center Arms Co.*, the Court spoke neutrally to the question of whether deference was due, stating that "even if they were entitled to deference," the revenue rulings proffered in that case did not apply to the questions there at issue. 504 U.S. 505, 518 n. 9, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992). In *Commissioner v. Schleier*, the Court noted that revenue rulings "may not be used to overturn the plain language of a statute," 515 U.S. 323, 336 n. 8, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995), a point consistent with all of the varieties of deference cited *infra* notes 8, 9, & 10.

6. Revenue Ruling 87–113 was issued the year following the 1986 amendments, and has constituted the Service's consistent position for the 12 years since it was issued.

7. *Chevron* held that if a "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

8. See *Johnson City Med. Ctr. v. United States*, 999 F.2d 973, 975–76 (6th Cir.1993) (adopting *Chevron*-like deference).

9. See, e.g., *First Chicago NBD Corp. v. Commissioner*, 135 F.3d 457, 458–59 (7th Cir. 1998) (holding that revenue rulings deserve "some weight" and are "entitled to respectful consideration," but "not to the deference that the *Chevron* doctrine requires in its domain") (citations omitted); *Farmar v. United States*, 231 Ct.Cl. 642, 689 F.2d 1017, 1024 n. 12 (Ct.Cl.1982) (stating that revenue rulings "are entitled to some consideration and carry some weight," and noting "Commissioner's authority to choose between reasonable interpretations").

10. See, e.g., *Gillespie v. United States*, 23 F.3d 36, 39 (2d Cir.1994) ("Revenue rulings issued by the IRS are entitled to great deference, and have been said to have the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code.") (internal quotation marks and citations omitted); *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1145 (3d Cir.1993) ("We give weight to IRS revenue rulings and do not disregard them unless they conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable.") (internal quotation marks and citations omitted); *Foil v. Commissioner*, 920 F.2d 1196, 1201 (5th Cir.1990) (noting that revenue rulings are entitled to "respectful consideration," but will be disregarded if in conflict with the statute or its legislative history, or if otherwise unreasonable); *United States v. Howard*, 855 F.2d 832, 836 (8th Cir.1988) (giving "weight" and according "respectful consideration").

(D.C.Cir.1997). We need not announce a precise calibration here, either. Telecom does not dispute that some deference would be due Revenue Ruling 87–113 if it were consistent with the statute's language and legislative history, although it argues that even then the degree of deference should be minimal.[11] But utilizing even a minimal level of deference—or imposing only a minimal burden of clarity under the first interpretive guide discussed above—is sufficient to decide this case. As we discuss below, the IRS' construction of the statute is more than consistent with the statutory language and legislative history, and Telecom has been unable to point to anything that, with any measure of clarity, entitles it to the deductions it seeks.

### IV

In this Part, we consider Telecom's first claim: that under the 1986 amendments, the basis of transition property should be reduced by the actual amount of ITC ultimately used by the taxpayer, rather than by the amount available in the year in which the asset is placed in service.

### A

The government's contrary argument is grounded in the language of several statutory sections. It begins with section 48(q)(1), the provision requiring that basis be reduced by the ITC. *See* 26 U.S.C. § 48(q)(1) (1988).[12] That section, as modified by section 49(d)(1)(A), provides that "if a credit is determined under section 46(a) ... the basis of such property shall be reduced by [100 percent] of the amount of the credit so determined." *Id.* § 48(q)(1); *see id.* § 49(d)(1)(A).[13] Hence, to establish the amount by which the basis must be reduced, we must look to "the amount of the credit so determined" under section 46(a). That section, in turn, provides that "the amount of the investment credit determined under this section for any taxable year shall be an amount equal to" the sum of certain percentages of "the qualified investment" as "determined under subsection[ ] (c)." *Id.* § 46(a).[14] And

---

11. At oral argument, counsel for Telecom agreed that the *Davis* standard governs, but argued for a minimal level of deference because Revenue Ruling 87–113 does not contain an express explanation for its construction of the relevant statutory sections. The ruling does, however, discuss the same statutory language upon which the IRS relies in this case, and sets forth the Service's interpretation of that language. It notes that "section 48(q)(1) requires the taxpayer to reduce the basis" by the "credit determined," and subsequently states that the "basis must be reduced in the year the property is placed in service." Rev. Rul. 87–113,1987–2 C.B. 33, 34–35. *Compare* discussion *infra* Part IV.A. Counsel conceded that this degree of explanation would ordinarily be entitled to some weight, were it not for the assertedly contrary legislative history discussed *infra* Part IV.B.

12. In this subpart, citations to 26 U.S.C. §§ 46, 48, and 49 are to the versions of those sections in effect during 1986–90. In 1990, the transitional rules at issue here were removed from the Code. *See* Revenue Reconciliation Act of 1990, Pub.L. No. 101–508, § 11813(a), 104 Stat. 1388–400, 1388–536.

13. Section 48(q)(1) states:

> For purposes of this subtitle, if a credit is determined under section 46(a) with respect to section 38 property, the basis of such property shall be reduced by 50 percent of the amount of the credit so determined.

Section 49(d)(1) states in part:

> In the case of periods after December 31, 1985, with respect to so much of the credit determined under section 46(a) with respect to transition property as is attributable to the regular investment credit (as defined in subsection (c)(5)(B))—
>
> (A) paragraphs (1), (2), and (7) of section 48(q) and section 48(d)(5) shall be applied by substituting "100 percent" for "50 percent" each place it appears...

Congress made technical amendments to § 49 in 1988 and incorporated the effective date of the original § 49 of the Tax Reform Act of 1986. *See* Technical and Miscellaneous Revenue Act of 1988(TAMRA), Pub.L. No. 100–647, §§ 1002(e), 1019, 102 Stat. 3342, 3367 & 3593. The version of § 49 quoted above incorporates those amendments.

14. Section 46(a) states in part:

> For purposes of section 38, the amount of the investment credit determined under this

subsection (c), in turn, defines "qualified investment" by reference to property "placed in service" during the taxable year. *See id.* § 46(c)(1).[15] Putting these provisions together, the IRS concludes that basis must be reduced by the amount of the credit "determined," and that this refers to the credit for which the property qualified during the taxable year in which the property was placed in service.

■ The interpretation the IRS advances here is the one reflected in Revenue Ruling 87–113 and adopted by the court below, *see MCI,* 26 F.Supp.2d at 10, by the Court of Federal Claims, *see B.F. Goodrich v. United States,* 32 Fed. Cl. 571, 572 (Fed. Cl.1995), and by the Federal Circuit, *see B.F. Goodrich,* 94 F.3d at 1549. In the words of the Federal Circuit, "[s]ince the investment tax credit is determined when the property is placed in service, and the statute mandates a reduction in the basis when the credit is determined, we hold that the basis of transition property must be reduced when the taxpayer

placed the property in service." *Id.* We find this interpretation to be a more than reasonable construction of the words of the statutory provisions.[16]

Telecom, of course, disagrees. In its briefs, it contends that the language of sections 46, 48 and 49 makes "clear" that the haircut on ITC carryforwards must be taken into account in calculating adjustments to depreciable basis. *See* Telecom Br. at 15. At oral argument, however, Telecom conceded that the statutory language is "confusing and technical." More important, Telecom was unable to cite any clear language in support of its position. Rather than rely on specific language, Telecom's fundamental contention is that the three sections must be read as an "integrated whole," and that if one does so, the validity of its position becomes manifest. *Id.* Telecom's argument is that section 49,[17] which imposes the haircut on the ITC, must be understood to alter the basis adjustment provisions of section 48(q)(1) so

section for any taxable year shall be an amount equal to the sum of the following percentages of the qualified investment (as determined under subsections (c) and (d))....

15. Section 46(c)(1) states in part:
For purposes of this subpart, the term "qualified investment" means, with respect to any taxable year ...—
(A) the applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service during such taxable year....

16. As Telecom notes, *B.F. Goodrich* arose in a different procedural posture from the instant case. Here, the taxpayer initially reduced its basis by the full amount of the ITC allowed in the year the property was placed in service, and subsequently sought to increase the basis through a refund claim. In *B.F. Goodrich,* by contrast, instead of initially reducing its basis by the full amount of the ITC, the taxpayer reduced it only enough to reflect the 6.5% credit it "reasonabl[y] expect[ed]" to receive in the carryforward year. This procedural difference, however, did not drive the Federal Circuit's opinion. Although the court did hold that the statute "leaves no room for consideration of Goodrich's 'reasonable expectations,' " 94 F.3d at 1549, it reached that

conclusion because, like the IRS, it read the statute as providing that an "investment tax credit is determined when the property is placed in service." *Id.*

17. Section 49(c) states in part:

(1) .... Any portion of the current year business credit under section 38(b) for any taxable year beginning after June 30, 1987, which is attributable to the regular investment credit shall be reduced by 35 percent.
(2) .... Any portion of the business credit carryforward under section 38(a)(1) attributable to the regular investment credit which has not expired as of the close of the taxable year preceding the 1st taxable year of the taxpayer beginning after June 30, 1987, shall be reduced by 35 percent.
(3) .... In the case of any taxable year beginning before and ending after July 1, 1987—
(A) any portion of the current year business credit under section 38(b) for such taxable year, or
(B) any portion of the business credit carryforward under section 38(a)(1) to such year,
which is attributable to the regular investment credit shall be reduced by the applicable percentage.

that they reflect not only the haircut on current-year credits, but the haircut on credits carried forward as well.[18]

If this were Congress' intent, it would not be an unreasonable one. But as already noted, there is nothing in the language of any of the three statutory provisions that commands this interpretation. Rather, the clearest language in the statute indicates that the key question is when the credit is "determined," for that is the time at which the basis must be reduced. *See* 26 U.S.C. § 48(q)(1) (1988). And while it would not be unreasonable to conclude that a credit is not "determined" until it is used, the government's contention that a credit is determined when it first becomes available, i.e., when the asset is placed in service, is also reasonable. Indeed, the government's construction is the more reasonable of the two in light of section 46(c)'s definition of qualified investment by reference to property "placed in service" during the taxable year.[19]

### B

Telecom attempts to buttress its argument by directing our attention to the legislative history of the Tax Reform Act of 1986, which it insists "unambiguously" supports its position. *See* Telecom Br. at 20. According to Telecom, the Conference

Report on the Act clearly demonstrates that Congress intended basis adjustments to reflect the haircut applied to carryforward credits.[20] That Report states, in pertinent part:

> *Full basis adjustment.*
>
> A taxpayer is required to reduce the basis of property that qualifies for transition relief ("transition property") by the full amount of investment credits earned with respect to the transition property (after application of the phased-in 35–percent reduction, described below)....
>
> *Reduction of ITC carryforwards and credits claimed under transitional rules*
>
> . . . .
>
> Under the conference agreement, the investment tax credit allowable for carryovers is reduced by 35 percent. The reduction in investment tax credit carryovers is phased in with the corporate rate reduction. The 35–percent reduction is fully effective for taxable years beginning on or after July 1, 1987.... The investment tax credit earned on transition property is reduced in the same manner as carryovers.
>
> . . . .

---

**18.** Telecom further contends that there is no ground for the IRS' conclusion that § 49 should apply to §§ 46 and 48 in four other circumstances, while refusing to apply it as requested by Telecom. *See* Telecom Reply Br. at 5–6. But unlike the application Telecom seeks, in each of the other circumstances the application is clear from the text of the statute. *See* 26 U.S.C. § 49(a) (1988) (repealing the ITC); *id.* § 49(c)(1) ("reduc[ing] by 35 percent" the "current year investment credit" for tax years beginning after June 30, 1987); *id.* § 49(d)(1) (providing "full basis adjustment" by "substituting '100 percent' for '50 percent' each place it appears" in § 48(q)); *id.* §§ 49, 48(q) (adjusting basis to reflect current year business credit "determined under section 46(a)" as reduced by the percentages prescribed in § 49(c)).

**19.** Even Telecom concedes that a credit is at least "initially" determined at that time, since

depreciation begins when the asset is placed in service, *see* 26 U.S.C. § 168(d)(1), (d)(4), and since the assets's basis must be calculated in order to take a depreciation deduction.

**20.** Telecom also relies on language contained in an explanation of the Tax Reform Act prepared by the Staff of the Joint Committee on Taxation. *See* STAFF OF JOINT COMM. ON TAXATION, 99TH CONG., 2D SESS., GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1986, at 123 (Comm. Print 1987). We need not consider what, if any, weight should be given to this post-enactment publication, *see Estate of Wallace v. Commissioner,* 965 F.2d 1038, 1050 n. 15 (11th Cir. 1992); *McDonald v. Commissioner,* 764 F.2d 322, 336 n. 25 (5th Cir.1985), because the language cited by Telecom does not add anything material to the text of the Conference Report.

As described above, a full basis adjustment is required with respect to the reduced amount of the investment tax credit. Thus, for transition property that is eligible for a 6.5 percent investment tax credit, the basis reduction would be with respect to the 6.5 percent credit, not the unreduced 10 percent credit.

H.R. Conf. Rep. No. 99–841, at II–63 to –64 (1986), U.S. Code Cong. & Admin. News at 4075, 4151–52 (underlining added).

Telecom argues that the first sentence quoted above indicates that a property's basis should be reduced to reflect the ITC haircut actually received in the carryforward year, since it states that a taxpayer must reduce the basis by the amount of the ITC "after application of the phased-in 35–percent reduction." *Id.* Although this is not an unreasonable reading, the sentence is not unambiguous. It does not state whether it refers to the phased-in reduction that applies to a credit used in the same year in which the property is placed in service (a current-year credit), or whether it refers to the phased-in reduction that applies to a carryforward. The government, the district court, and the Federal Circuit all read the sentence as referring to current-year rather than carryforward credits—largely because the sentence is not in the subsequent section entitled *"Reduction of ITC carryforwards and credits,"* but rather in the preceding section whose title does not mention carryforwards. *See B.F. Goodrich,* 94 F.3d at 1549; *MCI,* 26 F.Supp.2d at 11. Although Telecom rightly points to a number of

indications that the sections are interrelated (for example, cross-references to material "described below" in the first section and to material "described above" in the second), these do not resolve the question with clarity because the referenced material does not itself indicate to which year it refers.

Telecom also points to the last paragraph of the quoted excerpt, which is contained in a section that does refer to both current-year credits and carryforwards. That sentence states that "for transition property that *is eligible* for a 6.5 percent investment tax credit, the basis reduction would be with respect to the 6.5 percent credit, not the unreduced 10 percent credit." H.R. Conf. Rep. No. 99–841, at II–64, U.S. Code Cong. & Admin. News at 4075, 4152 (emphasis added). But this sentence contains an ambiguity of its own: the meaning of the word "eligible." The government's view, and that of the other courts to have considered the question, is that a taxpayer is eligible for the full amount of the credit available to it in the year in which it places an asset in service. That the taxpayer may not be able to use the credit for which its property is eligible because of the peculiarities of the taxpayer's individual situation does not render the property itself ineligible. *See MCI,* 26 F.Supp.2d at 10; *B.F. Goodrich,* 32 Fed. Cl. at 573 ("When property is placed in service, it is eligible for the credit irrespective of whether the credit later may be carried forward and reduced."). We conclude that the government's interpretation of the legislative history is at least as reasonable as that of Telecom.[21]

---

**21.** The government also argues that Telecom's interpretation is foreclosed by Congress' failure to adopt a technical amendment, proposed by industry representatives during the development of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub.L. No. 100–647, 102 Stat. 3342, that would have permitted precisely the upward adjustment in basis Telecom seeks in this case. This post–1986 legislative history, however, "is a hazardous basis for inferring the intent of an earlier Congress." *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110

S.Ct. 2668, 110 L.Ed.2d 579 (1990) (internal quotation marks and citations omitted). On the other hand, the statements submitted in the course of that failed effort do indicate that industry representatives believed the basis adjustment provisions were ambiguous and could be read as the IRS reads them here. *See* Staff of H.R. Comm. on Ways and Means, Written Comments on H.R. 2636, The Technical Corrections Act of 1987, Vol. 1, 100th Cong., 2d Sess., 418–27 & 429–32 (Comm. Print 1988).

## C

The final component of Telecom's argument is an appeal to two "principles of tax policy" which, it argues, require us to interpret the statute as Telecom does. But even if that kind of appeal could overcome the conclusions drawn above regarding the statutory language and legislative history, we would still find the tax policy principles at issue here too ambiguous and indeterminate to guide our construction.

Telecom's first contention is that depreciation deductions are governed by a principle of "full cost recovery"—i.e., allowing taxpayers to use depreciation to deduct the full amount of their investments—and that only its interpretation of the interaction between depreciation deductions and the ITC ensures such recovery. Telecom argues that "[i]n economic terms, the investment tax credit can be viewed as the government's co-investment in a taxpayer's property." Telecom Br. at 9. Thus, to determine the taxpayer's "share" of the investment, the ITC must be deducted from the property's initial cost. To ensure full cost recovery, the taxpayer must then be permitted to deduct the balance as depreciation.

Translating this analysis to our simplified example, Telecom's contention is that, because it received a $65,000 credit on a $1,000,000 investment when it used its ITC in 1989 (when the ITC percentage was 6.5%), its share of the investment in the property was $935,000. Accordingly, $935,000 should be the basis used to calculate its depreciation deductions. Under the IRS' view, however, Telecom was required to subtract $100,000 from the asset's $1,000,000 cost to arrive at its basis, because the property was placed into service in 1986 (when the ITC percentage was 10%). According to Telecom, limiting its deductions to the resulting basis,$900,000, renders it unable to recover its full costs.

The government's first response is that depreciation deductions and the tax basis upon which they are computed must be determined by application of the provisions of the Internal Revenue Code, and not by appeal to notions of "full cost recovery"—a concept unmentioned in the Code. Whatever the merit of this dispute regarding the policy underlying the depreciation deduction,[22] however, the question at issue here involves the interrelationship *between* the depreciation deduction and the ITC. While Telecom contends that the ITC should be viewed as "economically" equivalent to a government investment in the taxpayer's property, over the years Congress has offered a number of far more general rationales for the different combinations of depreciation deductions and ITCs it has enacted.[23] Indeed, even Tele-

---

**22.** In *Lenkin v. District of Columbia,* we said that in interpreting a statutory section that "leaves for the courts the definition of basis for 'reasonable' depreciation allowances, their polestar is a basis that will enable the taxpayer to recover his investment in the asset." 461 F.2d at 1229 (interpreting D.C.Code § 47–1583e (Supp. IV 1971)). Sections 46, 48 and 49, however, do not leave the measure of basis "for the courts" to determine. Moreover, even Telecom concedes that a policy of full cost recovery cannot explain ERTA's 1981 elimination of the requirement that basis be reduced by salvage value, which plainly permits the recovery of more than the asset's full cost. *See* 26 U.S.C. § 168(f)(9) (1982). Telecom has a similar problem explaining ERTA's adoption of ACRS itself, which permits accelerated depreciation schedules over predetermined periods generally shorter than the useful life of an asset, and hence permits taxpayers to take full depreciation deductions before an asset's true useful life has ended. *See Simon v. Commissioner,* 68 F.3d 41, 44–45 (2d Cir.1995); *Liddle v. Commissioner,* 65 F.3d 329, 334 (3d Cir.1995); S.Rep. No. 97–144, at 48.

**23.** *See, e.g.,* S. Rep. No. 99–313, at 96 (concluding that repeal of ITC would permit "[a] large reduction in the top corporate tax rate" and thereby "encourag[e] the efficient allocation of all resources"); S.Rep No. 97–494,. at 123, U.S. Code Cong. & Admin. News at 888 (concluding that under TEFRA, the combination of ACRS deductions and the ITC would "provide investment incentives comparable to those in a system without an income tax"); *cf. Simon,* 68 F.3d at 44–45 (noting that ERTA "altered the depreciation scheme" for "reasons other than sound accounting practice,"

com concedes that a principle of full cost recovery cannot explain why in most years prior to the enactment of TEFRA (1982) basis did not have to be reduced by ITC at all, or why between TEFRA and the Tax Reform Act of 1986 basis had to be reduced by only 50% of ITC. Fine-tuning the principle assertedly at issue here, Telecom argues that although these provisions permitted *more* than full cost recovery, Congress has never permitted *less*. This fine-tuning, however, weakens the overall coherence of the principle Telecom urges us to follow.

The government further argues that notwithstanding the basis adjustment Telecom was required to make, the company has already recovered more than the full cost of its investments. As the government notes, a tax credit is a dollar-for-dollar reduction in a taxpayer's tax liability. A deduction, on the other hand, is a dollar-for-dollar reduction in the taxable income used to compute tax liability, and thus only reduces taxes by an amount equal to the deduction multiplied by the taxpayer's marginal rate. Hence, for a taxpayer like Telecom which was in the 34% marginal bracket, a tax credit of $10 is roughly equivalent to a tax deduction of $30. Applying this analysis to Telecom's actual tax situation, the government calculates that the combination of Telecom's depreciation deductions and the deduction-value of its ITCs substantially exceeded its total investment in the transition properties. *See* Gov't Br. at 40 (citing First Stipulation of Facts at 7 (J.A. 65)). Although Telecom rightly notes that (at least initially) Congress intended the ITC to have an incentive effect in addition to the benefit of depreciation deductions, the government's argument does take some of the air out of Telecom's claim not to have recovered its economic costs. Moreover, we must be cognizant of the fact that we

are dealing with transition rules here, and that regardless of Congress' initial rationale for the combination of the ITC and depreciation deduction, we have little indication of what Congress' intentions were for the transition—other than there be a phase-out period that would inevitably involve some compromise between the goal of more efficient resource allocation, *see* S.Rep. No. 99–313, at 96, and a concern for fair treatment of investors' reasonable expectations.

Telecom contends that its interpretation of the statute is compelled by a second principle of tax policy as well—i.e., that similarly situated taxpayers must be treated in the same way. Taxpayers who place property in service in the same year should be treated the same, Telecom argues. This assertedly can only be accomplished if a taxpayer who cannot use a credit in that year is permitted to recover as much of his investment cost as one who can.

We are not persuaded by Telecom's argument. Taxpayers who place property in service in the same year *are* treated the same under Revenue Ruling 87–113. All such taxpayers have available to them the same ITC and the same basis reduction, *if* they can use the credit in that year. The differential impact of which Telecom complains is not due to the revenue ruling, but rather to Telecom's individual tax situation—that is, to the fact that it had insufficient tax liability in the current year to make the ITC useful. Indeed, many of the Internal Revenue Code's provisions, although neutral on their face, have a differential impact depending upon taxpayers' individual circumstances, yet we generally do not regard that as a sign of inequitable disparate treatment.[24] In any event, the indeterminacy of the application of this

particularly "as a stimulus for economic growth").

**24.** Even the ITC, in its pre–1986 incarnation, had such a differential effect. Although a company that had to carry its credit forward

several years would ultimately receive nominally the same ITC as a company that could use it immediately, it would enjoy significantly less present value.

principle to the question before us makes it an insufficient ground for rejecting the IRS' reasonable interpretation of the statutory language. *See B.F. Goodrich,* 94 F.3d at 1550 ("Nor are we convinced by Goodrich's hypotheticals that the alleged inconsistencies between so-called 'similarly situated taxpayers' warrant a construction which departs from the language enacted by Congress.").

In sum, we conclude that neither of Telecom's appeals to tax policy generates a principle sufficiently clear either to meet its burden of showing an entitlement to the deduction it seeks, or to overcome even a minimal level of deference to Revenue Ruling 87–113.[25]

## V

As alternatives to its argument under sections 46, 48, and 49, Telecom offers two other grounds for its refund claims. First, it contends that even if those sections do not entitle it to reach back to the years it put its property into service, "section 168 and its accompanying regulations" entitle it to increase its basis beginning in 1989— the year it actually used the ITC. Telecom, however, does not point to any specific language in section 168, which sets out the details of the Accelerated Cost Recovery System, to support this proposition. Indeed, its briefs do not quote the language of section 168 at all.

 Nor does Telecom point to any "accompanying regulations," at least not to any that have been enacted. Instead, it rests its claim upon the language of a proposed Treasury regulation, Prop. Treas. Reg. § 1.168–2(d)(3), 49 Fed.Reg. 5940, 5945–46 (1984). That regulation, proposed in 1984, cannot serve as the basis of any entitlement because it was never adopted. But even if it could, it would have no application here. The proposed

regulation provides for the redetermination of an asset's depreciable basis when the cost of the asset changes in a subsequent year, "e.g., due to contingent purchase price or discharge of indebtedness." *Id.* It offers as an example the case of a buyer who pays additional consideration for an asset after the year of its initial purchase because the purchase price was partially contingent on gross profits from the operation of the asset. Notwithstanding Telecom's claim that the haircut on ITC carryforwards represents the same "economic reality," there is no indication that the proposed regulation was intended to cover such a statutorily required reduction. That is hardly surprising, of course, since the Treasury Department proposed the regulation two years before Congress enacted the haircut.

As a second alternative, Telecom contends that it is entitled to a deduction pursuant to section 196(a), which permits taxpayers to take a deduction for certain unused business credits. That section provides:

> If any portion of the qualified business credits determined for any taxable year has not, after the application of section 38(c), been allowed to the taxpayer as a credit under section 38 for any taxable year, an amount equal to the credit not so allowed shall be allowed to the taxpayer as a deduction for the first taxable year following the last taxable year for which such credit could, under section 39, have been allowed as a credit.

26 U.S.C. § 196(a). Section 38(c), referenced in section 196, bars a taxpayer from taking the ITC in excess of its income tax liability in a given year, and is the reason Telecom could not use the credit in 1986 or 1987. Telecom contends that section 38(c), "in conjunction with the application of the ITC haircut to the ITC carryforwards,"

---

**25.** In light of our resolution of this issue, we need not consider the weight of the government's reference to its own "principle of tax policy"—namely, the principle that tax accounting generally proceeds on a year-by-year

basis, and that tax determinations generally are based on events occurring in the taxable year. *See* Gov't Br. at 45 (citing 26 U.S.C. § 441).

barred it "from taking the full ITC to which it was originally entitled." Telecom Br. at 33. According to Telecom, "[s]ection 196(a) provides a remedy for this incomplete cost recovery: it allows taxpayers to take deductions in the amounts of the ITC reduced by the haircut, thereby fully recovering their investment costs." *Id.*

■ Without deciding whether section 196(a) can ever provide a deduction to make up for the amount of the ITC haircut,[26] we agree with the Federal Circuit that the deduction contemplated by section 196(a) simply does not apply until, in the words of the section, "the first taxable year following the last taxable year for which such credit could, under section 39, have been allowed as a credit." Since section 39 provides that Telecom's credits may be carried forward for fifteen years,[27] the section 196 deduction is not available until the expiration of that fifteen-year period. *See B.F. Goodrich,* 94 F.3d at 1550–51; *see also* S.Rep. No. 97–494, at 123.

In support of the claim that it is nonetheless entitled to take the deduction in 1989, Telecom argues that the "unique nature" of the ITC haircut for carryforwards, which once applied reduces the ITC forever, should make the year before the haircut the "last taxable year" for which the full credit could have been allowed. Telecom Br. at 33–34. Whatever the reasonableness of this argument as a matter of tax policy, it cannot overcome section 39's express reference to the fifteen-year carryforward period. Accordingly, we reject

Telecom's final effort to secure a deduction.

## VI

We uphold the interpretation of the Tax Reform Act reflected in Revenue Ruling 87–113, and reject the two alternative grounds Telecom offers in support of its refund claims. The decision of the district court, granting summary judgment for the United States, is therefore affirmed.

---

**26.** The district court held that "[s]ection 196(a) authorizes deductions for carryforward credits that have expired" because the taxpayer had insufficient tax liabilities against which to offset them during the allowable carryforward period, "not for credits that are disallowed by reason of § 49(c)" and its statutory haircut. *MCI,* 26 F.Supp.2d at 13; *see* S.Rep. No. 97–494, at 123, U.S. Code Cong. & Admin. News at 888 ("A deduction will be allowed equal to the amount of the basis adjustment in the event a credit for which a basis adjustment has been made expires at the end of the 15-year carryover period."); Rev. Rul.

87–113 (concluding that "section 196 only applies to credits disallowed by reason of section 38(c), pertaining to tax limitation, and not to credits disallowed by reason of section 49(c)(1), (2) or (3)"); *see also* 26 U.S.C. § 49(c)(4) (1988) ("The amount of the reduction of the regular investment credit under paragraphs (1) and (2) shall not be allowed as a credit for any taxable year.").

**27.** *See* 26 U.S.C. § 39(a)(1) (1988). Under the current Code, the carryforward period is 20 years. *See id.* § 39(a)(1) (Supp. III 1997).