United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 6, 1999 Decided October 15, 1999 

 No. 98-5361

 Telecom*USA, Inc., and subsidiaries, 
 Appellants

 v.

 United States of America, 
 Appellee

 Consolidated with 
 98-5362

 Appeals from the United States District Court 
 for the District of Columbia 
 (No. 96cv00258) 
 (No. 96cv00259)

 Albert H. Turkus argued the cause for appellants. With 
him on the briefs were Pamela F. Olson and Julia M. 
Kazaks.

 Joan I. Oppenheimer, Attorney, U.S. Department of Jus-
tice, argued the cause for appellee. With her on the brief 
were Loretta C. Argrett, Assistant Attorney General, Wilma 
A. Lewis, U.S. Attorney, and David I. Pincus, Attorney, U.S. 
Department of Justice.

 Before: Wald, Randolph, and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Garland.

 Garland, Circuit Judge: Telecom*USA, Inc. and its sub-
sidiaries, and MCI Communications Corporation and its sub-
sidiaries, (collectively, "Telecom"), appeal the district court's 
ruling that Telecom is not entitled to the income tax refund it 
seeks. The case concerns transition rules enacted by Con-
gress in 1986 to cushion the impact of the repeal of the 
investment tax credit (ITC). Telecom's principal contention 
is that its basis in depreciable property should be reduced by 
the amount of ITC it received in the year to which it carried 
its ITC forward. Following the lead of the Federal Circuit 
and the Court of Federal Claims, the district court rejected 
this argument and held that Telecom must instead reduce its 
basis by the larger amount of ITC first available to it in the 
year in which it placed the property in service. We agree 
with the district court and the other courts that have consid-
ered this issue, and affirm.

 I

 To put Telecom's claims in context, we begin with a brief 
history of the depreciation deduction and the ITC. The 
Internal Revenue Code has long provided for depreciation 
deductions through which a property owner can deduct the 
cost of its property over the property's useful life. See 26 
U.S.C. s 167(a); 26 U.S.C. s 23(l ) (1934); United States v. 
Ludey, 274 U.S. 295, 297-300 (1927). Under the straight line 
method of depreciation, for example, an asset with an initial 
cost of $1,000,000, a salvage value of $50,000, and a useful life 
of 10 years would generate annual deductions of $95,000. See 
26 U.S.C. s 167(b)(1) (1988); 26 C.F.R. s 1.167(b)-1. Vari-
ous other methods of depreciation also have been permitted. 

See, e.g., 26 U.S.C. s 167(b)(2) (1988) (double declining bal-
ance method); id. s 167(b)(3) (sum of the years-digits meth-
od); see 26 C.F.R. ss 1.167(b)-2, 1.167(b)-3.

 In the Economic Recovery Tax Act of 1981 (ERTA), Con-
gress adopted a new set of depreciation rules called the 
Accelerated Cost Recovery System (ACRS). See Pub. L. No. 
97-34, sec. 201(a), s 168, 95 Stat. 172, 203 (codified as amend-
ed at 26 U.S.C. s 168). Intended to stimulate economic 
expansion, ACRS permits recovery of capital costs for most 
tangible depreciable property by using accelerated methods 
over predetermined periods that are generally shorter than 
the useful life of the asset. See 26 U.S.C. s 168(e)(1); S. Rep. 
No. 97-144, at 48 (1981). ACRS also eliminates the salvage 
value limitation, hence allowing the entire cost of the property 
to be depreciated. See ERTA, sec. 201, s 168(f)(9), 95 Stat. 
at 216.

 Although not as old as the depreciation deduction, the 
investment tax credit dates back to the Kennedy Administra-
tion and was also designed to stimulate the economy by 
encouraging investment. See Revenue Act of 1962, Pub. L. 
No. 87-834, s 2, 76 Stat. 960, 962-73; H.R. Conf. Rep. No. 
87-2508, at 14 (1962). The most recent incarnation of the 
ITC, prior to amendment and repeal in 1986, gave taxpayers 
a one-time credit of 10% of the cost of the property. See 26 
U.S.C. s 46 (1982). The credit was a dollar-for-dollar offset 
against a taxpayer's tax liability, see id. s 39(a), but could not 
be used if the taxpayer had insufficient tax liability for the 
year, see id. s 46(a)(3). The unused credits could, however, 
be carried back and carried forward a specified number of 
years to reduce the taxpayer's liabilities in those years. See 
id. s 46(b).

 The combined use of ITCs and depreciation deductions 
gave taxpayers generous benefits. For an asset costing 
$1,000,000, the taxpayer could both claim an ITC of $100,000 
(10% of the cost) and deduct $1,000,000 worth of depreciation 
(the full cost of the asset). In 1982, Congress concluded that 
this combination was distorting the allocation of capital re-
sources and determined to reduce the level of benefits. See 
S. Rep. No. 97-494, at 122 (1982). A new provision, enacted 

as part of the Tax Equity and Fiscal Responsibility Act of 
1982 (TEFRA), provided that an asset's "basis"--the value of 
the property used to determine the total available deprecia-
tion deductions--would be reduced by 50% of the amount of 
the ITC. See Pub. L. No. 97-248, s 205(a), 96 Stat. 324, 427 
(codified at 26 U.S.C. s 48(q)(1) (1982)). Hence, although an 
asset originally costing $1,000,000 would continue to yield an 
ITC of $100,000, it would generate a total of only $950,000 
worth of depreciation ($1,000,000 minus 50% of the $100,000 
credit).

 In 1986, Congress concluded that the ITC was still distort-
ing investment activity by channeling too much investment 
into tax-favored sectors. See S. Rep. No. 99-313, at 96 (1986). 
Thus, in the Tax Reform Act of 1986, Congress repealed the 
ITC for property purchased in 1986 and thereafter. See Pub. 
L. No. 99-514, s 211, 100 Stat. 2085, 2166-70 (codified as 
amended at 26 U.S.C. s 49(a) (1988)).1 It made an exception, 
however, for "transition property"--property purchased prior 
to 1986 but placed in service in 1986 or later. For such 
property, the ITC was phased out over a number of years. 
For calendar year taxpayers, transition property placed in 
service in 1986 received the full 10% credit; property placed 
in service in 1987 received a reduced credit of 8.25% of cost; 
and property placed in service in 1988 or later received a 
credit of only 6.5%. See 26 U.S.C. s 46; id. s 49(b), (c)(1), 
(c)(3)(A), (c)(5)(A) (1988).2 The phased reduction is known 
colloquially as the ITC "haircut."

 The 1986 amendments included two other changes of signif-
icance for this case. First, the haircut was also applied to 
credits carried forward from the year in which they were first 
available to the taxpayer. Credits carried forward for use in 
1987 were reduced to 8.25%; those carried forward to 1988 

__________
 1 The Tax Reform Act repealed the "regular" investment tax 
credit at issue here. See id. s 211, 100 Stat. at 2166; 26 U.S.C. 
s 49(a) (1988). Other investment credits survive. See 26 U.S.C. 
s 46.

 2 Telecom is a calendar year taxpayer. MCI Communications 
Corp. is a fiscal year taxpayer as to which slightly different 
percentages apply. See id. s 49(c)(3).

and subsequent years were reduced to 6.5%. See id. 
s 49(c)(2), (c)(3)(B), (c)(5)(A). Second, the amount of the 
basis adjustment for purposes of determining depreciation 
was changed from 50% to 100% of the amount of the ITC. 
See id. s 49(d)(1).

 The following year, the Internal Revenue Service (IRS, or 
"the Service") issued a revenue ruling to guide taxpayers with 
respect to the operation of the 1986 amendments. See Rev. 
Rul. 87-113, 1987-2 C.B. 33. Example 1 of that ruling 
considered the case of a $1,000,000 machine purchased in 1985 
and placed in service in 1986, the final 10% year. The ruling 
stated that under those circumstances, the taxpayer was 
entitled to an ITC of $100,000 (10% of the $1,000,000 cost) 
and had to reduce the machine's depreciable basis by 100% of 
that amount, (i.e., to $900,000).

 But what if the taxpayer were unable to use the credit in 
1986, and could not use it until 1988? Did the basis for 
depreciation deductions have to be reduced by the 10% credit 
available in 1986, the year the property was placed in service, 
or by the 6.5% credit available in 1988, the year to which the 
taxpayer carried the credit forward? Example 3 of Revenue 
Ruling 87-113 addressed that issue, and concluded that the 
basis had to be reduced by the amount of the credit available 
in the year the property was placed in service. In the 
example, the credit available to the company when the prop-
erty was placed in service in 1986 was $100,000. Accordingly, 
following the 100% basis reduction rule, the basis had to be 
reduced to $900,000. This, the IRS concluded, was the case 
even though the amount of the credit the company received 
was only $65,000 when it was eventually used in 1988. The 
company, the IRS said, was "not allowed to increase its basis 
in the property to reflect the reduction in the investment 
credit carryforward." Id. at 35.

 II

 As Telecom acknowledges, its case presents the same situa-
tion as that addressed in Example 3 of Revenue Ruling 

87-113, and the IRS has treated it in precisely the same way. 
See Telecom Br. at 18 n.12. Telecom owned transition prop-
erties placed in service in calendar years 1986 and 1987. The 
ITC percentages available for those properties in those years 
were 10% and 8.25%, respectively. When calculating its 
depreciation deductions in the years the properties were 
placed in service, Telecom reduced its bases by amounts that 
reflected those percentages. Telecom was unable to use its 
ITCs immediately, however, because it had insufficient tax 
liabilities in those years; it therefore carried the credits 
forward to 1989 and thereafter. Under the ITC haircut, the 
percentage received by Telecom in those years was only 
6.5%.3

 Telecom filed claims for refunds with the IRS, seeking the 
additional depreciation deductions it could have taken had it 
calculated its properties' bases using the ITCs it actually 
received. The IRS denied the claims, and Telecom filed 
refund actions in the district court. Telecom advanced one 
principal theory and two alternatives in support of its posi-
tion. Its principal contention was that several interconnected 
provisions of the Internal Revenue Code permitted it to 
amend its earlier returns by adjusting its properties' bases 
upward to reflect the amounts of ITC it actually used. Alter-
natively, Telecom argued that 26 U.S.C. s 168, as construed 
in a proposed treasury regulation, entitled it to adjust its 
bases in the carryforward years to reflect the effective 
change in the cost of its properties brought about by the 
haircut applied when its ITCs were carried forward. As a 
second alternative, Telecom contended that 26 U.S.C. s 196, 

__________
 3 The "Telecom" reference in this paragraph is only to 
Telecom*USA, Inc. and its subsidiaries. As noted supra note 2, 
MCI Communications Corporation is a fiscal year taxpayer. It 
owns transition properties placed in service in fiscal years 1986, 
1987, and 1988. The ITC percentages available for those properties 
were 10%, 10%, and 7.375%, respectively. Like Telecom, MCI 
carried its ITCs forward to 1989 and subsequent years. As the 
principles involved are the same, we confine our textual discussion 
to the calendar year situation faced by Telecom.

which provides deductions for portions of tax credits that a 
taxpayer has not been allowed to use, entitled it to deductions 
for the difference between the amounts of ITC allowable in 
the initial and carryforward years.

 The district court rejected Telecom's arguments on cross-
motions for summary judgment. See MCI Communications 
Corp. v. United States, 26 F. Supp. 2d 6 (D.D.C. 1998). 
Relying both on Revenue Ruling 87-113 and on the opinion of 
the U.S. Court of Appeals for the Federal Circuit in B.F. 
Goodrich Co. v. United States, 94 F.3d 1545 (Fed. Cir. 1996), 
which denied a taxpayer's virtually identical claim, the court 
rejected Telecom's argument that it should be permitted to 
adjust its original basis. The court also rebuffed Telecom's 
alternative efforts to utilize sections 168 and 196, holding 
those sections inapplicable to the circumstances at issue here.

 III

 On appeal, Telecom presses all of the arguments it raised 
below. There are no factual disputes, and we review the 
district court's grant of summary judgment de novo. See Tao 
v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994). To decide this 
case, we must analyze the interplay of three quite technical 
statutory provisions. Fortunately, we are not left wholly to 
our own devices, but rather are assisted by two important 
interpretive guides. Equally fortunate, the two point in the 
same direction.

 The first guide instructs that a taxpayer who seeks a 
deduction bears the burden of demonstrating a clear entitle-
ment. See New Colonial Ice Co. v. Helvering, 292 U.S. 435, 
440 (1934) ("[O]nly as there is clear provision therefor can any 
particular deduction be allowed."); Lenkin v. District of 
Columbia, 461 F.2d 1215, 1225 (D.C. Cir. 1972) (applying New 
Colonial Ice rule to depreciation deductions); cf. United 
States v. Centennial Sav. Bank FSB, 499 U.S. 573, 583-84 
(1991) (citing "rule that tax-exemption and -deferral provi-
sions are to be construed narrowly"); United States v. Wells 

Fargo Bank, 485 U.S. 351, 354-55 (1988) ("[E]xemptions from 
taxation are not to be implied; they must be unambiguously 
proved."). At oral argument, Telecom agreed that it bears 
this burden, but insisted that its entitlement to deductions is 
clear.

 The second interpretive guide requires us to accord at least 
some deference to the IRS' revenue ruling. Although a 
revenue ruling does not have the force and effect of Treasury 
Department Regulations, see 26 C.F.R. s 601.601(d)(2)(v)(d), 
it does constitute "an official interpretation by the Service," 
id. s 601.601(d)(2)(i)(a). Accordingly, the Supreme Court 
and virtually all of the Circuits have indicated that revenue 
rulings are entitled to some degree of deference.4

 In Davis v. United States, 495 U.S. 472, 484 (1990), the 
Court indicated that revenue rulings are entitled to "consider-
able weight where they involve the contemporaneous con-
struction of a statute and where they have been in long use"5
--two conditions that are roughly satisfied here.6 Davis did 

__________
 4 See generally Estate of McLendon v. Commissioner, 135 F.3d 
1017, 1023 (5th Cir. 1998) (noting that "virtually every circuit 
recognizes some form of deference," and that only the Tax Court 
takes the "position that revenue rulings are nothing more than the 
legal contentions of a frequent litigant") (citing Pasqualini v. 
Commissioner, 103 T.C. 1, 8 (1994)); John F. Coverdale, Court 
Review of Tax Regulations and Revenue Rulings in the Chevron 
Era, 64 Geo. Wash. L. Rev. 35, 81-84 (1995).

 5 Subsequently, in United States v. Thompson/Center Arms Co., 
the Court spoke neutrally to the question of whether deference was 
due, stating that "even if they were entitled to deference," the 
revenue rulings proffered in that case did not apply to the questions 
there at issue. 504 U.S. 505, 518 n.9 (1992). In Commissioner v. 
Schleier, the Court noted that revenue rulings "may not be used to 
overturn the plain language of a statute," 515 U.S. 323, 336 n.8 
(1995), a point consistent with all of the varieties of deference cited 
infra notes 8, 9, & 10.

 6 Revenue Ruling 87-113 was issued the year following the 1986 
amendments, and has constituted the Service's consistent position 
for the 12 years since it was issued.

not, however, address how this standard compared to the 
relatively high level of deference applicable to agency inter-
pretations of ambiguous statutes under Chevron U.S.A. Inc. 
v. Natural Resources Defense Council, Inc., 467 U.S. 837 
(1984).7 The Courts of Appeals have accorded revenue rul-
ings varying degrees of deference, ranging from the level 
utilized in Chevron,8 to "some weight,"9 to variations in be-
tween.10

 This court has not had the occasion to decide the precise 
degree of deference due to revenue rulings, although we have 

__________
 7 Chevron held that if a "statute is silent or ambiguous with 
respect to the specific issue, the question for the court is whether 
the agency's answer is based on a permissible construction of the 
statute." Id. at 843.

 8 See Johnson City Med. Ctr. v. United States, 999 F.2d 973, 975-
76 (6th Cir. 1993) (adopting Chevron-like deference).

 9 See, e.g., First Chicago NBD Corp. v. Commissioner, 135 F.3d 
457, 458-59 (7th Cir. 1998) (holding that revenue rulings deserve 
"some weight" and are "entitled to respectful consideration," but 
"not to the deference that the Chevron doctrine requires in its 
domain") (citations omitted); Farmar v. United States, 689 F.2d 
1017, 1024 n.12 (Ct. Cl. 1982) (stating that revenue rulings "are 
entitled to some consideration and carry some weight," and noting 
"Commissioner's authority to choose between reasonable interpreta-
tions").

 10 See, e.g., Gillespie v. United States, 23 F.3d 36, 39 (2d Cir. 
1994) ("Revenue rulings issued by the IRS are entitled to great 
deference, and have been said to have the force of legal precedent 
unless unreasonable or inconsistent with the provisions of the 
Internal Revenue Code.") (internal quotation marks and citations 
omitted); Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1145 (3d 
Cir. 1993) ("We give weight to IRS revenue rulings and do not 
disregard them unless they conflict with the statute they purport to 
interpret or its legislative history, or if they are otherwise unrea-
sonable.") (internal quotation marks and citations omitted); Foil v 
Commissioner, 920 F.2d 1196, 1201 (5th Cir. 1990) (noting that 
revenue rulings are entitled to "respectful consideration," but will 
be disregarded if in conflict with the statute or its legislative 
history, or if otherwise unreasonable); United States v. Howard, 

referred to such rulings as "the second most important 
agency pronouncements that interpret the Code" and have 
looked to them when neither the statute nor Treasury regula-
tions provided clear guidance. Stichting Pensioenfonds Voor 
de Gezondheid v. United States, 129 F.3d 195, 198 (D.C. Cir. 
1997). We need not announce a precise calibration here, 
either. Telecom does not dispute that some deference would 
be due Revenue Ruling 87-113 if it were consistent with the 
statute's language and legislative history, although it argues 
that even then the degree of deference should be minimal.11 
But utilizing even a minimal level of deference--or imposing 
only a minimal burden of clarity under the first interpretive 
guide discussed above--is sufficient to decide this case. As 
we discuss below, the IRS' construction of the statute is more 
than consistent with the statutory language and legislative 
history, and Telecom has been unable to point to anything 
that, with any measure of clarity, entitles it to the deductions 
it seeks.

 IV

 In this Part, we consider Telecom's first claim: that under 
the 1986 amendments, the basis of transition property should 
be reduced by the actual amount of ITC ultimately used by 
the taxpayer, rather than by the amount available in the year 
in which the asset is placed in service.

__________
855 F.2d 832, 836 (8th Cir. 1988) (giving "weight" and according 
"respectful consideration").

 11 At oral argument, counsel for Telecom agreed that the Davis 
standard governs, but argued for a minimal level of deference 
because Revenue Ruling 87-113 does not contain an express expla-
nation for its construction of the relevant statutory sections. The 
ruling does, however, discuss the same statutory language upon 
which the IRS relies in this case, and sets forth the Service's 
interpretation of that language. It notes that "section 48(q)(1) 
requires the taxpayer to reduce the basis" by the "credit deter-
mined," and subsequently states that the "basis must be reduced in 
the year the property is placed in service." Rev. Rul. 87-113, 
1987-2 C.B. 33, 34-35. Compare discussion infra Part IV.A. 
Counsel conceded that this degree of explanation would ordinarily 
be entitled to some weight, were it not for the assertedly contrary 
legislative history discussed infra Part IV.B.

 A

 The government's contrary argument is grounded in the 
language of several statutory sections. It begins with section 
48(q)(1), the provision requiring that basis be reduced by the 
ITC. See 26 U.S.C. s 48(q)(1) (1988).12 That section, as 
modified by section 49(d)(1)(A), provides that "if a credit is 
determined under section 46(a) ... the basis of such property 
shall be reduced by [100 percent] of the amount of the credit 
so determined." Id. s 48(q)(1); see id. s 49(d)(1)(A).13 
Hence, to establish the amount by which the basis must be 
reduced, we must look to "the amount of the credit so 
determined" under section 46(a). That section, in turn, pro-
vides that "the amount of the investment credit determined 
__________
 12 In this subpart, citations to 26 U.S.C. ss 46, 48, and 49 are to 
the versions of those sections in effect during 1986-90. In 1990, the 
transitional rules at issue here were removed from the Code. See 
Revenue Reconciliation Act of 1990, Pub. L. No. 101-508, 
s 11813(a), 104 Stat. 1388-400, 1388-536.

 13 Section 48(q)(1) states:

 For purposes of this subtitle, if a credit is determined under 
 section 46(a) with respect to section 38 property, the basis of 
 such property shall be reduced by 50 percent of the amount 
 of the credit so determined.
 
Section 49(d)(1) states in part:

 In the case of periods after December 31, 1985, with respect 
 to so much of the credit determined under section 46(a) with 
 respect to transition property as is attributable to the regu-
 lar investment credit (as defined in subsection (c)(5)(B))--
 
 (A) paragraphs (1), (2), and (7) of section 48(q) and section 
 48(d)(5) shall be applied by substituting "100 percent" for 
 "50 percent" each place it appears.... 
 
Congress made technical amendments to s 49 in 1988 and incorpo-
rated the effective date of the original s 49 of the Tax Reform Act 
of 1986. See Technical and Miscellaneous Revenue Act of 1988 
(TAMRA), Pub. L. No. 100-647, ss 1002(e), 1019, 102 Stat. 3342, 
3367 & 3593. The version of s 49 quoted above incorporates those 
amendments.

under this section for any taxable year shall be an amount 
equal to" the sum of certain percentages of "the qualified 
investment" as "determined under subsection[ ] (c)." Id. 
s 46(a).14 And subsection (c), in turn, defines "qualified 
investment" by reference to property "placed in service" 
during the taxable year. See id. s 46(c)(1).15 Putting these 
provisions together, the IRS concludes that basis must be 
reduced by the amount of the credit "determined," and that 
this refers to the credit for which the property qualified 
during the taxable year in which the property was placed in 
service.

 The interpretation the IRS advances here is the one re-
flected in Revenue Ruling 87-113 and adopted by the court 
below, see MCI, 26 F. Supp. 2d at 10, by the Court of Federal 
Claims, see B.F. Goodrich v. United States, 32 Fed. Cl. 571, 
572 (Fed. Cl. 1995), and by the Federal Circuit, see B.F. 
Goodrich, 94 F.3d at 1549. In the words of the Federal 
Circuit, "[s]ince the investment tax credit is determined when 
the property is placed in service, and the statute mandates a 
reduction in the basis when the credit is determined, we hold 
that the basis of transition property must be reduced when 
the taxpayer placed the property in service." Id. We find 
this interpretation to be a more than reasonable construction 
of the words of the statutory provisions.16
__________
 14 Section 46(a) states in part:

 For purposes of section 38, the amount of the investment 
 credit determined under this section for any taxable year 
 shall be an amount equal to the sum of the following percent-
 ages of the qualified investment (as determined under sub-
 sections (c) and (d)).... 
 
 15 Section 46(c)(1) states in part:

 For purposes of this subpart, the term "qualified investment" 
 means, with respect to any taxable year ...--
 
 (A) the applicable percentage of the basis of each new 
 section 38 property (as defined in section 48(b)) placed in 
 service during such taxable year....
 
 16 As Telecom notes, B.F. Goodrich arose in a different procedur-
al posture from the instant case. Here, the taxpayer initially 

 Telecom, of course, disagrees. In its briefs, it contends 
that the language of sections 46, 48 and 49 makes "clear" that 
the haircut on ITC carryforwards must be taken into account 
in calculating adjustments to depreciable basis. See Telecom 
Br. at 15. At oral argument, however, Telecom conceded that 
the statutory language is "confusing and technical." More 
important, Telecom was unable to cite any clear language in 
support of its position. Rather than rely on specific lan-
guage, Telecom's fundamental contention is that the three 
sections must be read as an "integrated whole," and that if 
one does so, the validity of its position becomes manifest. Id. 
Telecom's argument is that section 49,17 which imposes the 

__________
reduced its basis by the full amount of the ITC allowed in the year 
the property was placed in service, and subsequently sought to 
increase the basis through a refund claim. In B.F. Goodrich, by 
contrast, instead of initially reducing its basis by the full amount of 
the ITC, the taxpayer reduced it only enough to reflect the 6.5% 
credit it "reasonabl[y] expect[ed]" to receive in the carryforward 
year. This procedural difference, however, did not drive the Feder-
al Circuit's opinion. Although the court did hold that the statute 
"leaves no room for consideration of Goodrich's 'reasonable expecta-
tions,' " 94 F.3d at 1549, it reached that conclusion because, like the 
IRS, it read the statute as providing that an "investment tax credit 
is determined when the property is placed in service." Id.

 17 Section 49(c) states in part:

 (1) .... Any portion of the current year business credit 
 under section 38(b) for any taxable year beginning after June 
 30, 1987, which is attributable to the regular investment 
 credit shall be reduced by 35 percent.
 
 2) .... Any portion of the business credit carryforward 
 under section 38(a)(1) attributable to the regular investment 
 credit which has not expired as of the close of the taxable 
 year preceding the 1st taxable year of the taxpayer begin-
 ning after June 30, 1987, shall be reduced by 35 percent.
 
 (3) .... In the case of any taxable year beginning before 
 and ending after July 1, 1987--
 
 (A) any portion of the current year business credit under 
 section 38(b) for such taxable year, or
 
haircut on the ITC, must be understood to alter the basis 
adjustment provisions of section 48(q)(1) so that they reflect 
not only the haircut on current-year credits, but the haircut 
on credits carried forward as well.18

 If this were Congress' intent, it would not be an unreason-
able one. But as already noted, there is nothing in the 
language of any of the three statutory provisions that com-
mands this interpretation. Rather, the clearest language in 
the statute indicates that the key question is when the credit 
is "determined," for that is the time at which the basis must 
be reduced. See 26 U.S.C. s 48(q)(1) (1988). And while it 
would not be unreasonable to conclude that a credit is not 
"determined" until it is used, the government's contention 
that a credit is determined when it first becomes available, 
i.e., when the asset is placed in service, is also reasonable. 
Indeed, the government's construction is the more reasonable 
of the two in light of section 46(c)'s definition of qualified 
investment by reference to property "placed in service" dur-
ing the taxable year.19

__________
 (B) any portion of the business credit carryforward under 
 section 38(a)(1) to such year,
 
 which is attributable to the regular investment credit shall be 
 reduced by the applicable percentage.
 
 18 Telecom further contends that there is no ground for the IRS' 
conclusion that s 49 should apply to ss 46 and 48 in four other 
circumstances, while refusing to apply it as requested by Telecom. 
See Telecom Reply Br. at 5-6. But unlike the application Telecom 
seeks, in each of the other circumstances the application is clear 
from the text of the statute. See 26 U.S.C. s 49(a) (1988) (repealing 
the ITC); id. s 49(c)(1) ("reduc[ing] by 35 percent" the "current 
year investment credit" for tax years beginning after June 30, 
1987); id. s 49(d)(1) (providing "full basis adjustment" by "substi-
tuting '100 percent' for '50 percent' each place it appears" in 
s 48(q)); id. ss 49, 48(q) (adjusting basis to reflect current year 
business credit "determined under section 46(a)" as reduced by the 
percentages prescribed in s 49(c)).

 19 Even Telecom concedes that a credit is at least "initially" 
determined at that time, since depreciation begins when the asset is 

 B
 Telecom attempts to buttress its argument by directing our 
attention to the legislative history of the Tax Reform Act of 
1986, which it insists "unambiguously" supports its position. 
See Telecom Br. at 20. According to Telecom, the Confer-
ence Report on the Act clearly demonstrates that Congress 
intended basis adjustments to reflect the haircut applied to 
carryforward credits.20 That Report states, in pertinent part:

 Full basis adjustment 

 A taxpayer is required to reduce the basis of property 
 that qualifies for transition relief ("transition property") 
 by the full amount of investment credits earned with 
 respect to the transition property (after application of the 
 phased-in 35-percent reduction, described below)....
 
 Reduction of ITC carryforwards and credits 
 claimed under transitional rules
 ....

 Under the conference agreement, the investment tax 
 credit allowable for carryovers is reduced by 35 percent. 
 The reduction in investment tax credit carryovers is 
 phased in with the corporate rate reduction. The 35-
 percent reduction is fully effective for taxable years 
 beginning on or after July 1, 1987.... The investment 
 tax credit earned on transition property is reduced in the 
 same manner as carryovers.
 __________
placed in service, see 26 U.S.C. s 168(d)(1), (d)(4), and since the 
assets's basis must be calculated in order to take a depreciation 
deduction.

 20 Telecom also relies on language contained in an explanation of 
the Tax Reform Act prepared by the Staff of the Joint Committee 
on Taxation. See Staff of Joint Comm. on Taxation, 99th Cong., 2d 
Sess., General Explanation of the Tax Reform Act of 1986, at 123 
(Comm. Print 1987). We need not consider what, if any, weight 
should be given to this post-enactment publication, see Estate of 
Wallace v. Commissioner, 965 F.2d 1038, 1050 n.15 (11th Cir. 1992); 
McDonald v. Commissioner, 764 F.2d 322, 336 n.25 (5th Cir. 1985), 
because the language cited by Telecom does not add anything 
material to the text of the Conference Report.

 

 . . . .
 
 As described above, a full basis adjustment is required 
 with respect to the reduced amount of the investment tax 
 credit. Thus, for transition property that is eligible for a 
 6.5 percent investment tax credit, the basis reduction 
 would be with respect to the 6.5 percent credit, not the 
 unreduced 10 percent credit.
 
H.R. Conf. Rep. No. 99-841, at II-63 to -64 (1986) (underlin-
ing added).

 Telecom argues that the first sentence quoted above indi-
cates that a property's basis should be reduced to reflect the 
ITC haircut actually received in the carryforward year, since 
it states that a taxpayer must reduce the basis by the amount 
of the ITC "after application of the phased-in 35-percent 
reduction." Id. Although this is not an unreasonable read-
ing, the sentence is not unambiguous. It does not state 
whether it refers to the phased-in reduction that applies to a 
credit used in the same year in which the property is placed 
in service (a current-year credit), or whether it refers to the 
phased-in reduction that applies to a carryforward. The 
government, the district court, and the Federal Circuit all 
read the sentence as referring to current-year rather than 
carryforward credits--largely because the sentence is not in 
the subsequent section entitled "Reduction of ITC carryfor-
wards and credits," but rather in the preceding section whose 
title does not mention carryforwards. See B.F. Goodrich, 94 
F.3d at 1549; MCI, 26 F. Supp. 2d at 11. Although Telecom 
rightly points to a number of indications that the sections are 
interrelated (for example, cross-references to material "de-
scribed below" in the first section and to material "described 
above" in the second), these do not resolve the question with 
clarity because the referenced material does not itself indicate 
to which year it refers.

 Telecom also points to the last paragraph of the quoted 
excerpt, which is contained in a section that does refer to both 
current-year credits and carryforwards. That sentence 
states that "for transition property that is eligible for a 6.5 
percent investment tax credit, the basis reduction would be 
with respect to the 6.5 percent credit, not the unreduced 10 

percent credit." H.R. Conf. Rep. No. 99-841, at II-64 (em-
phasis added). But this sentence contains an ambiguity of its 
own: the meaning of the word "eligible." The government's 
view, and that of the other courts to have considered the 
question, is that a taxpayer is eligible for the full amount of 
the credit available to it in the year in which it places an asset 
in service. That the taxpayer may not be able to use the 
credit for which its property is eligible because of the pecu-
liarities of the taxpayer's individual situation does not render 
the property itself ineligible. See MCI, 26 F. Supp. 2d at 10; 
B.F. Goodrich, 32 Fed. Cl. at 573 ("When property is placed 
in service, it is eligible for the credit irrespective of whether 
the credit later may be carried forward and reduced."). We 
conclude that the government's interpretation of the legisla-
tive history is at least as reasonable as that of Telecom.21

 C

 The final component of Telecom's argument is an appeal to 
two "principles of tax policy" which, it argues, require us to 
interpret the statute as Telecom does. But even if that kind 
of appeal could overcome the conclusions drawn above re-
garding the statutory language and legislative history, we 
would still find the tax policy principles at issue here too 
ambiguous and indeterminate to guide our construction.

__________
 21 The government also argues that Telecom's interpretation is 
foreclosed by Congress' failure to adopt a technical amendment, 
proposed by industry representatives during the development of the 
Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. 
L. No. 100-647, 102 Stat. 3342, that would have permitted precisely 
the upward adjustment in basis Telecom seeks in this case. This 
post-1986 legislative history, however, "is a hazardous basis for 
inferring the intent of an earlier Congress." Pension Benefit Guar. 
Corp. v. LTV Corp., 496 U.S. 633, 650 (1990) (internal quotation 
marks and citations omitted). On the other hand, the statements 
submitted in the course of that failed effort do indicate that 
industry representatives believed the basis adjustment provisions 
were ambiguous and could be read as the IRS reads them here. 
See Staff of H.R. Comm. on Ways and Means, Written Comments on 
H.R. 2636, The Technical Corrections Act of 1987, Vol. 1, 100th 
Cong., 2d Sess., 418-27 & 429-32 (Comm. Print 1988).

 Telecom's first contention is that depreciation deductions 
are governed by a principle of "full cost recovery"--i.e., 
allowing taxpayers to use depreciation to deduct the full 
amount of their investments--and that only its interpretation 
of the interaction between depreciation deductions and the 
ITC ensures such recovery. Telecom argues that "[i]n eco-
nomic terms, the investment tax credit can be viewed as the 
government's co-investment in a taxpayer's property." Tele-
com Br. at 9. Thus, to determine the taxpayer's "share" of 
the investment, the ITC must be deducted from the proper-
ty's initial cost. To ensure full cost recovery, the taxpayer 
must then be permitted to deduct the balance as depreciation.

 Translating this analysis to our simplified example, Tele-
com's contention is that, because it received a $65,000 credit 
on a $1,000,000 investment when it used its ITC in 1989 
(when the ITC percentage was 6.5%), its share of the invest-
ment in the property was $935,000. Accordingly, $935,000 
should be the basis used to calculate its depreciation deduc-
tions. Under the IRS' view, however, Telecom was required 
to subtract $100,000 from the asset's $1,000,000 cost to arrive 
at its basis, because the property was placed into service in 
1986 (when the ITC percentage was 10%). According to 
Telecom, limiting its deductions to the resulting basis, 
$900,000, renders it unable to recover its full costs.

 The government's first response is that depreciation deduc-
tions and the tax basis upon which they are computed must 
be determined by application of the provisions of the Internal 
Revenue Code, and not by appeal to notions of "full cost 
recovery"--a concept unmentioned in the Code. Whatever 
the merit of this dispute regarding the policy underlying the 
depreciation deduction,22 however, the question at issue here 
involves the interrelationship between the depreciation deduc-
tion and the ITC. While Telecom contends that the ITC 

__________
 22 In Lenkin v. District of Columbia, we said that in interpreting 
a statutory section that "leaves for the courts the definition of basis 
for 'reasonable' depreciation allowances, their polestar is a basis 
that will enable the taxpayer to recover his investment in the asset." 
461 F.2d at 1229 (interpreting D.C. Code s 47-1583e (Supp. IV 

should be viewed as "economically" equivalent to a govern-
ment investment in the taxpayer's property, over the years 
Congress has offered a number of far more general rationales 
for the different combinations of depreciation deductions and 
ITCs it has enacted.23 Indeed, even Telecom concedes that a 
principle of full cost recovery cannot explain why in most 
years prior to the enactment of TEFRA (1982) basis did not 
have to be reduced by ITC at all, or why between TEFRA 
and the Tax Reform Act of 1986 basis had to be reduced by 
only 50% of ITC. Fine-tuning the principle assertedly at 
issue here, Telecom argues that although these provisions 
permitted more than full cost recovery, Congress has never 
permitted less. This fine-tuning, however, weakens the over-
all coherence of the principle Telecom urges us to follow.

 The government further argues that notwithstanding the 
basis adjustment Telecom was required to make, the company 

__________
1971)). Sections 46, 48 and 49, however, do not leave the measure 
of basis "for the courts" to determine. Moreover, even Telecom 
concedes that a policy of full cost recovery cannot explain ERTA's 
1981 elimination of the requirement that basis be reduced by 
salvage value, which plainly permits the recovery of more than the 
asset's full cost. See 26 U.S.C. s 168(f)(9) (1982). Telecom has a 
similar problem explaining ERTA's adoption of ACRS itself, which 
permits accelerated depreciation schedules over predetermined pe-
riods generally shorter than the useful life of an asset, and hence 
permits taxpayers to take full depreciation deductions before an 
asset's true useful life has ended. See Simon v. Commissioner, 68 
F.3d 41, 44-45 (2d Cir. 1995); Liddle v. Commissioner, 65 F.3d 329, 
334 (3d Cir. 1995); S. Rep. No. 97-144, at 48.

 23 See, e.g., S. Rep. No. 99-313, at 96 (concluding that repeal of 
ITC would permit "[a] large reduction in the top corporate tax rate" 
and thereby "encourag[e] the efficient allocation of all resources"); 
S. Rep. No. 97-494, at 123 (concluding that under TEFRA, the 
combination of ACRS deductions and the ITC would "provide 
investment incentives comparable to those in a system without an 
income tax"); cf. Simon, 68 F.3d at 44-45 (noting that ERTA 
"altered the depreciation scheme" for "reasons other than sound 
accounting practice," particularly "as a stimulus for economic 
growth").

has already recovered more than the full cost of its invest-
ments. As the government notes, a tax credit is a dollar-for-
dollar reduction in a taxpayer's tax liability. A deduction, on 
the other hand, is a dollar-for-dollar reduction in the taxable 
income used to compute tax liability, and thus only reduces 
taxes by an amount equal to the deduction multiplied by the 
taxpayer's marginal rate. Hence, for a taxpayer like Telecom 
which was in the 34% marginal bracket, a tax credit of $10 is 
roughly equivalent to a tax deduction of $30. Applying this 
analysis to Telecom's actual tax situation, the government 
calculates that the combination of Telecom's depreciation 
deductions and the deduction-value of its ITCs substantially 
exceeded its total investment in the transition properties. 
See Gov't Br. at 40 (citing First Stipulation of Facts at 7 (J.A. 
65)). Although Telecom rightly notes that (at least initially) 
Congress intended the ITC to have an incentive effect in 
addition to the benefit of depreciation deductions, the govern-
ment's argument does take some of the air out of Telecom's 
claim not to have recovered its economic costs. Moreover, we 
must be cognizant of the fact that we are dealing with 
transition rules here, and that regardless of Congress' initial 
rationale for the combination of the ITC and depreciation 
deduction, we have little indication of what Congress' inten-
tions were for the transition--other than there be a phase-out 
period that would inevitably involve some compromise be-
tween the goal of more efficient resource allocation, see 
S. Rep. No. 99-313, at 96, and a concern for fair treatment of 
investors' reasonable expectations.

 Telecom contends that its interpretation of the statute is 
compelled by a second principle of tax policy as well--i.e., 
that similarly situated taxpayers must be treated in the same 
way. Taxpayers who place property in service in the same 
year should be treated the same, Telecom argues. This 
assertedly can only be accomplished if a taxpayer who cannot 
use a credit in that year is permitted to recover as much of 
his investment cost as one who can.

 We are not persuaded by Telecom's argument. Taxpayers 
who place property in service in the same year are treated 
the same under Revenue Ruling 87-113. All such taxpayers 

have available to them the same ITC and the same basis 
reduction, if they can use the credit in that year. The 
differential impact of which Telecom complains is not due to 
the revenue ruling, but rather to Telecom's individual tax 
situation--that is, to the fact that it had insufficient tax 
liability in the current year to make the ITC useful. Indeed, 
many of the Internal Revenue Code's provisions, although 
neutral on their face, have a differential impact depending 
upon taxpayers' individual circumstances, yet we generally do 
not regard that as a sign of inequitable disparate treatment.24 
In any event, the indeterminacy of the application of this 
principle to the question before us makes it an insufficient 
ground for rejecting the IRS' reasonable interpretation of the 
statutory language. See B.F. Goodrich, 94 F.3d at 1550 
("Nor are we convinced by Goodrich's hypotheticals that the 
alleged inconsistencies between so-called 'similarly situated 
taxpayers' warrant a construction which departs from the 
language enacted by Congress.").

 In sum, we conclude that neither of Telecom's appeals to 
tax policy generates a principle sufficiently clear either to 
meet its burden of showing an entitlement to the deduction it 
seeks, or to overcome even a minimal level of deference to 
Revenue Ruling 87-113.25

 V

 As alternatives to its argument under sections 46, 48, and 
49, Telecom offers two other grounds for its refund claims. 

__________
 24 Even the ITC, in its pre-1986 incarnation, had such a differen-
tial effect. Although a company that had to carry its credit forward 
several years would ultimately receive nominally the same ITC as a 
company that could use it immediately, it would enjoy significantly 
less present value.

 25 In light of our resolution of this issue, we need not consider the 
weight of the government's reference to its own "principle of tax 
policy"--namely, the principle that tax accounting generally pro-
ceeds on a year-by-year basis, and that tax determinations general-
ly are based on events occurring in the taxable year. See Gov't Br. 
at 45 (citing 26 U.S.C. s 441).

First, it contends that even if those sections do not entitle it 
to reach back to the years it put its property into service, 
"section 168 and its accompanying regulations" entitle it to 
increase its basis beginning in 1989--the year it actually used 
the ITC. Telecom, however, does not point to any specific 
language in section 168, which sets out the details of the 
Accelerated Cost Recovery System, to support this proposi-
tion. Indeed, its briefs do not quote the language of section 
168 at all.

 Nor does Telecom point to any "accompanying regula-
tions," at least not to any that have been enacted. Instead, it 
rests its claim upon the language of a proposed Treasury 
regulation, Prop. Treas. Reg. s 1.168-2(d)(3), 49 Fed. Reg. 
5940, 5945-46 (1984). That regulation, proposed in 1984, 
cannot serve as the basis of any entitlement because it was 
never adopted. But even if it could, it would have no 
application here. The proposed regulation provides for the 
redetermination of an asset's depreciable basis when the cost 
of the asset changes in a subsequent year, "e.g., due to 
contingent purchase price or discharge of indebtedness." Id. 
It offers as an example the case of a buyer who pays 
additional consideration for an asset after the year of its 
initial purchase because the purchase price was partially 
contingent on gross profits from the operation of the asset. 
Notwithstanding Telecom's claim that the haircut on ITC 
carryforwards represents the same "economic reality," there 
is no indication that the proposed regulation was intended to 
cover such a statutorily required reduction. That is hardly 
surprising, of course, since the Treasury Department pro-
posed the regulation two years before Congress enacted the 
haircut.

 As a second alternative, Telecom contends that it is entitled 
to a deduction pursuant to section 196(a), which permits 
taxpayers to take a deduction for certain unused business 
credits. That section provides:

 If any portion of the qualified business credits deter-
 mined for any taxable year has not, after the application 
 of section 38(c), been allowed to the taxpayer as a credit 
 
 under section 38 for any taxable year, an amount equal to 
 the credit not so allowed shall be allowed to the taxpayer 
 as a deduction for the first taxable year following the last 
 taxable year for which such credit could, under section 
 39, have been allowed as a credit.
 
26 U.S.C. s 196(a). Section 38(c), referenced in section 196, 
bars a taxpayer from taking the ITC in excess of its income 
tax liability in a given year, and is the reason Telecom could 
not use the credit in 1986 or 1987. Telecom contends that 
section 38(c), "in conjunction with the application of the ITC 
haircut to the ITC carryforwards," barred it "from taking the 
full ITC to which it was originally entitled." Telecom Br. at 
33. According to Telecom, "[s]ection 196(a) provides a reme-
dy for this incomplete cost recovery: it allows taxpayers to 
take deductions in the amounts of the ITC reduced by the 
haircut, thereby fully recovering their investment costs." Id.

 Without deciding whether section 196(a) can ever provide a 
deduction to make up for the amount of the ITC haircut,26 we 
agree with the Federal Circuit that the deduction contemplat-
ed by section 196(a) simply does not apply until, in the words 
of the section, "the first taxable year following the last 
taxable year for which such credit could, under section 39, 
have been allowed as a credit." Since section 39 provides 
that Telecom's credits may be carried forward for fifteen 

__________
 26 The district court held that "[s]ection 196(a) authorizes deduc-
tions for carryforward credits that have expired" because the 
taxpayer had insufficient tax liabilities against which to offset them 
during the allowable carryforward period, "not for credits that are 
disallowed by reason of s 49(c)" and its statutory haircut. MCI, 26 
F. Supp. 2d at 13; see S. Rep. No. 97-494, at 123 ("A deduction will 
be allowed equal to the amount of the basis adjustment in the event 
a credit for which a basis adjustment has been made expires at the 
end of the 15-year carryover period."); Rev. Rul. 87-113 (conclud-
ing that "section 196 only applies to credits disallowed by reason of 
section 38(c), pertaining to tax limitation, and not to credits disal-
lowed by reason of section 49(c)(1), (2) or (3)"); see also 26 U.S.C. 
s 49(c)(4) (1988) ("The amount of the reduction of the regular 
investment credit under paragraphs (1) and (2) shall not be allowed 
as a credit for any taxable year.").

years,27 the section 196 deduction is not available until the 
expiration of that fifteen-year period. See B.F. Goodrich, 94 
F.3d at 1550-51; see also S. Rep. No. 97-494, at 123.

 In support of the claim that it is nonetheless entitled to 
take the deduction in 1989, Telecom argues that the "unique 
nature" of the ITC haircut for carryforwards, which once 
applied reduces the ITC forever, should make the year before 
the haircut the "last taxable year" for which the full credit 
could have been allowed. Telecom Br. at 33-34. Whatever 
the reasonableness of this argument as a matter of tax policy, 
it cannot overcome section 39's express reference to the 
fifteen-year carryforward period. Accordingly, we reject 
Telecom's final effort to secure a deduction.

 VI

 We uphold the interpretation of the Tax Reform Act re-
flected in Revenue Ruling 87-113, and reject the two alterna-
tive grounds Telecom offers in support of its refund claims. 
The decision of the district court, granting summary judg-
ment for the United States, is therefore affirmed.

__________
 27 See 26 U.S.C. s 39(a)(1) (1988). Under the current Code, the 
carryforward period is 20 years. See id. s 39(a)(1) (Supp. III 1997).